288 F.2d 796
 UNITED STATES, Appellee,
v.
Charles H. GILLILAN, Albert A. Finer, Joseph R. Synder, Apex
Distributing Company, Inc., Wilshire Sales
Associates, Inc. and Melrose
Corporation, Appellants.
 No. 128, Docket 26331.
 United States Court of Appeals Second Circuit.
 Argued Dec. 9, 1960.
Decided April 5, 1961.
 
 Daniel H. Greenberg, New York City, for Charles H. Gillilan and others.
 Myles B. Amend, Myles B. Amend, Jr., New York City, of counsel for Charles H. Gillilan.
 Lyle W. Rucker, Los Angeles (Daniel H. Creenberg, New York City, of counsel), for Joseph R. Snyder.
 Marie L. McCann, Cornelius W. Wickersham, Jr., U.S. Atty., Eastern Dist. of New York, Brooklyn, N.Y., Eugene M. Grimmig, Asst. U.S. Atty., of counsel, for appellee.
 Before CLARK, WATERMAN and HAND, Circuit Judges.
 HAND, Circuit Judge.
 
 
 1
 These appeals arise upon a judgment of conviction before Judge Rayfiel upon eleven counts of an indictment, of which Counts One and Eleven were for 'conspiracy' and Counts Two to Ten were for 'Fraudulent' invoices paid by the Navy. There were a number of other counts which for one reason or another were dismissed. We shall first discuss Count One, then collectively Counts Two to Ten, and finally Count Eleven.
 
 
 2
 Count One charged a conspiracy under 371 to violate 281 of Title 18, U.S. Code, between the efendants, Gillilan, Finer, Snyder and three corporations controlled by Finer, in which they agreed that Gillilan, a retired admiral in the United States Navy, should receive 'compensation' for services rendered by him in relation to contracts with the United States for the sale or purchase of 'concentrated flavorings.' Finer sold the 'flavorings' to the Navy through the corporations, Snyder was his accountant and Gillian was employed by Finer under various titles. The business was carried on by means of what were called 'openend' contracts, which provided the total quantity of 'concentrates' that the Navy might demand under the contract and the prices at which they would be delivered, but did not bind the Navy until it later ordered the supplies. The contracts were divided into two groups: 'Ship's Stores' contracts, which were for goods to be resold to members of the crew, and 'Provisions'--'concentrates' that the Navy used in preparing the meals served to the crews. 'Ship's Stores' were themselves divided into two groups-- 'Ship's Stores Ashore,' which were sold at named places on land, and 'Ship's Stores Afloat,' sold on board a named ship to the crews individually for their personal use. The reason for these divisions does not appear and need not concern us, except that the regulations required separate contracts for each kind of transaction.
 
 
 3
 Count One alleged that it was part of the conspiracy that Gillilan should 'receive compensation for services rendered * * * in relation to contracts * * * in which the United States was a party'; and that he was to 'represent Apex and Melrose and other concerns in the sale of concentrated flavorings to the United States.' The judge in his charge to the jury only read large passages from this Count and then concluded with a quotation from the final paragraph of the Count that the conspiracy contemplated that Gillilan should be compensated 'for his services in soliciting and negotiating contracts * * * for the sale of Quix concentrated flavorings, and other products.' He then read the substance of the first paragraph of 281, but no part of the second paragraph, and Gillilan excepted to the omission.
 
 
 4
 The first sentence of the second paragraph, standing alone, protected Gillilan from any liability, because he was a 'retired officer not on active duty'; but there remained the question whether the second sentence of that paragraph did not deprive him of this immunity. The exact words of that sentence provide that a retired officer will be liable as though he were in the active discharge of his duties, if he 'represent any person in the sale of anything to the Government through the department in whose service he holds a retired status.' That obviously means that, although a retired officer is permitted to receive compensation 'in relation to any * * * contract,' he will nevertheless violate the section if he is 'representing' someone else in the 'sale' of anything to the United States 'through' his former department. In the case at bar this language demanded a decision whether what Gillilan did was to 'represent' the seller in 'sales' to the United States.
 
 
 5
 The judge did not attempt to define what conduct constituted 'representation' for sale, yet some definition was necessary. For example, an officer could hardly be said to 'represent' the seller if he merely delivered goods to the Navy which his employer had sold. We need not say whether only those officers 'represent' a seller who have authority to fix some of the terms of sale; but certainly the statute requires some definition of the meaning of the words which may not be left to the jury. Gillilan expressly raised the point, and the jury was left without instruction as to what was the necessary share in the negotiations that led to the sales. We do not hold that the evidence precluded a finding that he did 'represent' the Navy 'in the sales' (Seastrom v. United States, Ct.Cl., 177 F.Supp. 948, 951); but in a criminal prosecution, which this was, it was essential to advise them what kind of participation must be proved. The judgment in Count One must be reversed and the cause remanded for a new trial.
 
 
 6
 Next is the appeal by Finer and one of his corporations from Counts Two to Ten inclusive, which well all cast in the same model and were for violations of 1001 of Title 18: i.e., making false statements to an 'agency' of the United States. The Counts covered shipments of 'flavorings' sent by Finer and his corporations, payment for which after delivery was procured by certificates of agents of the sellers that the bills or invoices presented were 'correct and just.' The basis of the charge in each case was that the delivery of the goods had been to 'Ship's Stores Afloat' contrary to the contracts of purchase which had required delivery ashore. The bills in all instances had correctly shown consignments to specific ships, together with the number of the contract under which the shipment was made. In each case the certificate was alleged to be false within 1001, and designed to 'cover up' the irregularity of the purchase. The judge, as in the case of Count One, again merely read the Counts as they were alleged in the indictment and left it to the jury to say whether the crime had been proved. As a matter of interpretation we have no doubt that the phrase 'correct and just' should be understood as meaning that the claims were lawful and should be paid. Yet it appeared on their face that they violated the regulation which forbade sales of such goods to 'Ship's Stores Afloat.'
 
 
 7
 It is true that there was no specific evidence that the entries on the 'invoices' had been intended to 'cover up' the fact that the deliveries were unauthorized, and perhaps they had been, but it was essential that the jury should be told that such had been in fact the intent. We do not forget that the judge did make a general statement as to the meaning of the words 'unlawfully' and 'fraudulently,' applicable to his whole charge, but it seems to us that it was necessary to go further and be more specific as to these Counts. The statute, 1001, expressly makes it a part of the crime 'knowingly and willfully' to 'cover up' a material fact, or to use 'false writing or document knowing the same to contain any false, fictitious or fraudulent statement,' and this required that the jury be told unequivocally that the contradiction was a deliberate fraud. The charge did not tell the jury that they must find that the invoices had been put in for that purpose. The judgment as to these Counts is reversed and they are remanded for a new trial.
 
 
 8
 The jury also found the defendants Finer and Snyder and one of the corporations guilty under Count Eleven of a conspiracy to defraud the United States, 371 of Title 18. As in the case of the other Courts the judge merely read this Count to the jury and left it to them to say whether the evidence satisfied them that the conspiracy had been proved. As alleged, the conspiracy was to commit four separate 'frauds': (1) to sell Quix elsewhere than at one of the places named in the regulations; (2) to sell 'Quix' by false representation that the contracts allowed delivery to 'Ship's Stores Afloat'; (3) to represent to the buyers that 'Quix' was suitable to flavor ice cream and sherbets which they knew to be unture; and (4) to substaitute for 'Quix' another 'concentrate.' The judge's charge so far as we can see, sufficiently advised the jury of what they had to decide. It is true that in order to do so they had to resort to the Count, but the Count itself alleged the facts in such detail that no question of law was involved in applying the charge to the evidence. It is true that the first part of the conspiracy did require them to ascertain whether shipments were to be sold in places not authorized by the regulations and that involved acquaintance with what those places were; and the same was true of the second part which was for sales to 'Ship's Stores Afloat' (really only one instance of the first). However, there was no dispute about the meaning of either of those directions and therefore nothing to submit to the jury.
 
 
 9
 There is no inevitable necessity in a criminal case that the judge shall state the evidence in his charge-- 'marshal' it, as it is called in England. When as here the evidence is extremely complicated, it is a question for him to decide how much a detailed restatement in his charge will clarify the issues. We held in United States v. Cohen, 145 F.2d 82, 92 that it was enough if he 'stated the prosecution's charges in detail, and told that jury that those of the accused who had taken the stand, had denied their guilt.' We went on to say that if 'the judge had once embarked upon a consideration of the transactions in detail, he would have committed himself to a discussion of them all; otherwise he would surely have laid himself open to the charge of undue emphasis. On the other hand, to undertake such a Herculean task would not have helped the jury, but merely would have added to the weight of verbiage that they had already been called upon to bear.' Amid the extraordinary plethora of requests actually made there was none asking him to define the authorized delivery places, and he was justified in assuming that both sides agreed as to what they were. The verdict should not be disturbed.
 
 
 10
 Judgment on Count One and Counts Two to Ten reversed and a new trial ordered; judgment on Count Eleven affirmed.