**NATIONAL DAIRY PRODUCTS COR-
PORATION, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 17734.

United States Court of Appeals
Eighth Circuit.

Aug. 27, 1965.

Rehearing Denied Sept. 23, 1965.

John T. Chadwell, of Chadwell, Keck, Kayser, Ruggles & McLaren, Chicago, Ill., and Martin J. Purcell, of Morrison, Hecker, Cozad & Morrison, Kansas City, Mo., made argument for appellant and filed brief with John H. Lashly, of Lashly, Lashly, Rava, Hyndman & Rutherford, St. Louis, Mo.

Raymond P. Hernacki, Trial Atty., Dept. of Justice, and I. Daniel Stewart, Jr., Atty., Appellate Division, Dept. of Justice, Washington, D. C., made argument for appellee and filed brief with William H. Orrick, Jr., Asst. Atty. Gen., Antitrust Div., Dept. of Justice, and Robert B. Hummel, Atty., Antitrust Div., Dept. of Justice, Washington, D. C.

Before JOHNSEN, VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

National Dairy Products Corporation (National or appellant) has appealed from the judgment of conviction on seven counts of an indictment charging a conspiracy to fix prices and eliminate competition in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and on six counts charging sales of milk at unreasonably low prices for the purpose of destroying competition in violation of § 3 of the Robinson-Patman Act, 15 U.S.C. § 13a.[1]

The indictment alleged violations in seven different market areas. A Sherman Act violation and a Robinson-Patman Act violation were alleged to have occurred in each market area. Thus, Counts 1 and 2 related to Paola-Osawatomie, Kansas; Counts 3 and 4 to Sedalia, Missouri; 5 and 6 to Lexington, Missouri; 7 and 8 to Mexico, Missouri; 9 and 10 to Glasgow, Missouri; 11, 12 and 13 to Greater Kansas City; 14 and 15 to Butler, Missouri. Raymond J. Wise, a vice-president and director of National, was named as a defendant in Counts 11, 12 and 13.[2] The trial commenced on June 13, 1963, and proceeded without unnecessary interruption until August 16, 1963. Ninety-seven witnesses testified, over 7,000 pages of transcript were produced and more than 600 exhibits were introduced. The jury, after nearly three days of deliberation, returned verdicts

1. The indictment returned on September 16, 1959, contained 15 counts. Two intermediate appeals were taken by the United States from orders of the United States District Court (the late R. Jasper Smith). In United States v. Wise, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962), the Supreme Court reversed an order of the district court which had dismissed Wise, and held that the Sherman Act imposes personal liability upon corporate officials for acts done in violation of the Act. In United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) the court reversed the district court order which had dismissed the Robinson-Patman Act counts, and held that § 3 of the Robinson-Patman Act was not unconstitutionally vague as applied under the indictment.

2. Counts 1, 3, 5, 7, 9, 11, 12 and 14 alleged Sherman Act violations; Counts 2, 4, 6, 8, 10, 13 and 15 alleged Robinson-Patman Act violations.

of guilty on Counts 1 through 13 and verdicts of not guilty on Counts 14 and 15.

Post-trial motions for judgment notwithstanding the verdict and, in the alternative, for a new trial, were filed by both National and Wise. The motions were competently briefed by counsel. After oral argument the motions were denied. The court's supporting opinion is reported at 231 F.Supp. 663 (1964).

The Court (Honorable John W. Oliver) then fined National $50,000 (the maximum) for each of the seven Sherman Act violations, and $5,000 (the maximum) for each of the six Robinson-Patman Act violations, a total of $380,000. Wise was fined $25,000 on each of Counts 11 and 12 and $2,500 on Count 13, a total of $52,500. Wise also received a suspended jail sentence of three months on each of Counts 11, 12 and 13, to run concurrently.[3] Both National and Wise appealed but, later, Wise filed a motion to dismiss his appeal, which we granted on November 30, 1964.

Appellant advances six basic contentions relating to (1) the procedure for handling of grand jury minutes and appellant's motion to inspect portions used; (2) the court's instructions to the jury; (3) the court's attitude; (4) rulings on evidence; (5) the court's rejection of the circumstantial evidence rule and (6) the insufficiency of the evidence to make a jury case on Counts 1 and 2, relating to the Paola-Osawatomie market, and Counts 11 and 13, relating to the Greater Kansas City area market. Numerous subsidiary claims of error are presented in support of each basic contention.

Before examining, considering and disposing of appellant's contentions, a résumé of pertinent facts, ascertained from undisputed evidence, is in order.

National, a large company, is engaged in the business of purchasing, process-ing, distributing and selling milk and other dairy products throughout the United States. Its products are sold under several trade names, including "Seal-test" and "Kraft." During the period of time covered by the indictment, defendant Wise had been an officer and director of National in charge of its Sealtest Central Division, which included the midwestern states.

National operates a processing plant in Kansas City, Missouri, and has been in competition with other national dairies and local small dairies, both in the Greater Kansas City area (which consists of Jackson and Clay Counties, Missouri, and Wyandotte and Johnson Counties, Kansas) and in a number of smaller outlying cities and towns in Missouri and Kansas. In the Greater Kansas City market, National, through its employees, primarily distributes its products directly to stores and home delivery customers. In the other cities and towns in Missouri and Kansas it usually sells its milk in paper cartons to independent distributors, who in turn resell the milk to their own customers.

The Government, of course, urges that the jury's verdicts on all counts were responsive to, and fully supported by, the evidence. Although appellant challenged the legal sufficiency of the evidence as to all counts by filing timely motions for judgment of acquittal and post-trial motion for judgment notwithstanding the verdict in the district court, here appellant, in effect, concedes a submissible case was made as to all counts except 1 and 2, and 11 and 13.

However, appellant does contend that the trial court applied an erroneous standard in evaluating the evidence under all thirteen counts (and particularly under Count 11) of which appellant was found guilty. Arguing that the evidence was wholly circumstantial—not direct—

---

3. Post-trial proceedings held on June 22, 1964, in connection with imposition of the fines and sentence, show that on February 23, 1962, following entry of a plea of nolo contendere in the United States District Court of Maryland, National was fined a total of $12,500 for two Sherman Act violations and that on June 15, 1964, following a plea of nolo contendere in the United States District Court of Massachusetts, National was fined $25,000 for a Sherman Act violation.

appellant seeks application here, as it did below, of the circumstantial evidence rule under which "[u]nless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial judge to instruct the jury to return a verdict for the accused, and, where all the evidence is as consistent with innocence as with guilt, it is the duty of this court to reverse a judgment against the accused." Pevely Dairy Co. v. United States, 178 F.2d 363, 370 (8 Cir. 1949), citing Salinger v. United States, 23 F.2d 48, 52 (8 Cir. 1927).

In denying appellant's motion for judgment of acquittal at the close of the Government's case relating to Counts 11, 12 and 13, the trial court was of the view that this court's opinion in the Pevely Dairy case, supra, did not establish a "substantive rule of law" concerning the circumstantial evidence rule. Rather, the court determined that it should only "consider whether the evidence in its most favorable aspect to the Government is legally capable of allowing a jury to become persuaded of guilt." [4]

■ The so-called "circumstantial evidence" rule "is applicable only where the evidence is wholly circumstantial and if there is any direct evidence in the case for the government which would be sufficient if believed by the jury to show defendant's guilt, then the rule as to circumstantial evidence may not be invoked." Finnegan v. United States, 204 F.2d 105, at p. 114 (8 Cir. 1953). See also Pevely Dairy Co. v. United States, supra; Beatrice Foods Co. v. United States, 312 F.2d 29 (8 Cir. 1963); Sykes v. United States, 312 F.2d 232 (8 Cir. 1963); Hunt v. United States, 115 U.S. App.D.C. 1, 316 F.2d 652 (1963). Contrary to appellant's claim, the evidence was not wholly circumstantial. There was also some direct evidence. More-

over, even if we were to view the evidence as wholly circumstantial, the court would not be compelled to determine that all hypotheses flowing from the evidence were as consistent with innocence as with guilt; it would be for the jury to determine the guilt or innocence of the defendant.

■ In resolving the sufficiency of the evidence question we are required to view the evidence in the light most favorable to the Government, the prevailing party. "It is axiomatic by now that on appeal from a conviction it is not for us to weigh the evidence 'but only to consider whether the evidence in its most favorable aspect to the Government is legally capable of allowing a jury to become persuaded of guilt.'" Beatrice Foods Co. v. United States, supra, 312 F.2d at 40, and cases there cited.

*The Sufficiency of the Evidence.*

Before considering the sufficiency of the evidence under Counts 1 and 2, we take note of pertinent background information relating to Counts 1 through 10, the so-called "distributor counts." These counts are concerned with situations in which small dairies had been selling gallon jugs of milk in local markets at a lower price than the price at which National was selling milk in individual paper half gallons. The price differential was necessitated by the disadvantages inherent in gallon jug milk. Gallon jugs contain more milk than many purchasers prefer to buy at one time; jugs are heavy, unwieldy, breakable and not as easily stored as paper cartons. There is usually a deposit required on a gallon jug which is only refundable after the jug has been cleaned and returned. Since small dairies can produce and sell milk in gallon jugs more inexpensively than large dairies can sell milk in paper half gallons, the small dairies were able

---

4. The trial judge was attempting to follow the rule of Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In overruling the motion for a directed verdict, he indicated to counsel that the jury should be given an instruction on circumstantial evidence. The court did instruct on circumstantial evidence and no exception was taken to that instruction, nor complaint made of it on this appeal.

to offer a substantial differential and still make a profit.

National and its distributors, dissatisfied with gallon jug competition, decided to force the small dairies to raise prices or National would lower its prices enough to substantially reduce or eliminate the differential between the price of a gallon jug and two paper half gallons. National was able to successfully reduce the differential to a point where the small dairies lost considerable business and some of the smaller dairies were forced to either drop the sale of milk in gallon jugs or close their businesses.

*Count 1.*

Count 1 of the indictment charged that "[b]eginning in or about January, 1955" "and continuing until the return of this indictment" (September 16, 1959) National conspired with its distributor, Merle Martin, "to fix in-store milk prices and to eliminate competition in the sale of milk in the Paola-Osawatomie, Kansas market." [5]

The conspiracy alleged in Count 1 was: (a) that Martin would sell milk to stores at prices agreed upon with National; (b) that National would guarantee Martin a specific gross margin of profit on such sales; (c) that National and Martin would persuade, induce, and coerce small dairies (Pure Gold Dairy and Sheehan Dairy) to fix and maintain a price differential acceptable to National between the gallon jug and two half gallon paper cartons; (d) that National would sell milk to Martin below cost and Martin would resell it to stores at prices agreed upon with National for the purpose of restricting or eliminating the sale of milk by the small dairies.

In challenging the Count 1 evidence, appellant contends: (a) that a resale price-fixing agreement between National and its sole distributor in the Paola-Osawatomie market does not constitute unlawful price-fixing in violation of § 1 of the Sherman Act; (b) that National cannot be held responsible for the conduct of its wholly owned subsidiary,

Chapman Dairy, during 1955 and 1956; and (c) that there is no competent evidence, after December 31, 1956, to prove that National had entered into a conspiracy with its distributor, Martin, in violation of § 1 of the Sherman Act.

A review of the evidence shows that appellant's contentions are without merit.

■ There is no longer any doubt about the illegality of vertical price-fixing agreements. Such arrangements, unless they fall within the scope of a state resale price maintenance law, have been found to be illegal time and time again. White Motor Co. v. United States, 194 F.Supp. 562 (1961), rev'd on other grounds, 372 U.S. 253, 83 S.Ct.. 696, 9 L.Ed.2d 738 (1963); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

Prior to December 31, 1956, Chapman Dairy was a wholly owned subsidiary of National; National's board of directors approved or disapproved of the proposed list of directors for Chapman; Chapman received National's approval before making capital investments; Chapman's personnel policies were established by National; Chapman's key employees had stock option plans to purchase National stock; Wise, a National official, had power to override Chapman's president (who had originally been recommended for office by Wise); Wise was kept informed on all decisions made by Chapman's president; Chapman's products were sold under the Sealtest trade name; Wise spent many months in Kansas City (where Chapman Dairy was located); Chapman's production reports were submitted to National for approval and National's officials often conducted the monthly sales department meetings where prices, market conditions, costs and competitors' prices were discussed. We deem it unnecessary to enumerate the other additional facts in the record which show

5. "In-store milk prices" are the prices at which milk is sold to stores by a distributor.

National's close relationship with Chapman.

On December 31, 1956, Chapman Dairy was formally merged with National. In its annual report to stockholders of record in 1956, National described its merger with Chapman as a mere simplification of its corporate structure to increase operational efficiency and to produce savings in income tax. Wisé characterized his relationship with the president of National's subsidiary (and after the merger, the manager) as that of "a partner."

■■ The evidence clearly indicates that Chapman was not an *independent* subsidiary of National. The relationship between parent and subsidiary was not one of stock ownership alone. Chapman was run by National in accordance with National's policies and objectives, and with independent existence in form only. In such a situation the courts may disregard the legal fiction of corporate entity. Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918). See also Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); United States v. Delaware, Lackawanna & Western R. R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438 (1915). Cf. Consolidated Sun Ray, Inc. v. Oppenstein, 335 F.2d 801 (8 Cir. 1964). Since Chapman Dairy was merely an operating division of National Dairy in corporate form, the jury was entitled to find National liable for any conspiratorial conduct in which Chapman might have engaged with its distributor, Martin, prior to the formal merger of Chapman with National on December 31, 1956.

It is hardly debatable that there is an abundance of evidence to show a conspiracy between National, acting through Chapman Dairy, and Martin during 1955 and 1956. During those years and, in fact, during the entire period of time covered by the indictment, the significant competitors in Osawatomie were, in addition to Martin, Pure Gold Dairy and Sheehan Dairy. The only significant competitor in Paola was Pure Gold Dairy. From the evidence the jury was free to find that the conspirators were successful in reducing the differential in price between the gallon jugs, sold by Pure Gold and Sheehan Dairies, and the paper half gallons, sold by National, to a level which made it impossible for the gallon jugs to remain on the market. After a series of price cuts designed to (and which, in fact, did) narrow the differential between gallon jugs and paper half gallons, the smaller dairies lost considerable business and one of them was forced to discontinue the gallon jug and sell its milk in paper half gallons.

Neither are we able to agree with appellant that there is no evidence to show that, subsequent to December 31, 1956, National had a price-fixing agreement with its distributor, Merle Martin. There was probative evidence from which the jury could find that National dictated Martin's prices; indeed, Martin freely admitted that he adhered to the prices indicated by the Sealtest representatives. Additionally, it was proved that National sold its milk to Martin at a loss during July and August of 1958; in fact, in August, Martin received milk from National at a price lower than National's cost for raw milk.

*Count 2.*

■ Count 2 of the indictment charged that "[b]eginning on or about July 15, 1958 and continuing thereafter until about August 27, 1958" National sold milk to its "distributor in the Paola-Osawatomie, Kansas market at unreasonably low prices", "at prices below National's cost" for the purpose of destroying competition.

Appellant tacitly concedes that the evidence affords proof that appellant sold to Martin below cost for about six weeks in July and August, 1958. It contends, however, that there is no evidence that appellant did this "for the purpose of restricting or eliminating the sale of milk" by Pure Gold and Sheehan. Of course, National's officers made no direct references to, nor statements of, Na-

tional's predatory intent. But the absence of *direct* evidence of that nature does not mean that there was *no* evidence of predatory intent. The jury had the right to consider all of the facts and circumstances and it was fully justified in finding the requisite intent from the course of conduct pursued by appellant. Furthermore, appellant does not question or challenge the evidence of predatory intent which was an essential element of the convictions under the other Robinson-Patman Act counts. Such evidence was relevant for the purpose of showing intent under this count. Cf. Copeland v. United States, 80 U.S.App.D.C. 308, 152 F.2d 769 (1945); Kowalchuk v. United States, 176 F.2d 873, 877–878 (6 Cir. 1949).

The sum total of the evidence bearing upon Counts 1 and 2 has received our careful consideration. Further elaboration thereon is unnecessary. Viewing the evidence in the light most favorable to the Government, we are convinced that a factual issue was presented, that the court properly denied the motion for judgment of acquittal, and that the jury verdict is supported by substantial evidence.

*Count 11.*

■ National and Raymond J. Wise were indicated and made defendants in this count and "[a]ll out-of-State dairies, doing business in the Greater Kansas City market" and their officers and agents were named as co-conspirators. This count charged that "[b]eginning in or about September 1957 and continuing until some time in October of 1957" National, Wise and the other co-conspirators engaged in a conspiracy to "eliminate price competition in the sale of milk in the Greater Kansas City market" in violation of § 1 of the Sherman Act.

Allegedly the conspiracy consisted of a continuing agreement, the substantial terms of which were: (a) to hold meetings in Chicago, Illinois, and Kansas City, Missouri, to discuss ways and means to (1) require Meyer Sanitary Milk Company to withdraw a discount it had offered on or about August 1, 1957, to Milgram Food Stores, and (2) require small dairies selling milk in glass gallon containers to narrow the price differential between milk sold in such containers and milk sold in paper cartons; (b) to start a milk price war on or about September 13, 1957; (c) to limit the milk price war to the Greater Kansas City market; (d) to increase the milk prices on or about October 10, 1957, to levels above those prevailing in the Greater Kansas City market prior to September 13, 1957, and (e) to induce and coerce small dairies selling milk in glass gallon containers to raise their prices on or about October 10, 1957.

Relying upon the circumstantial evidence rule discussed, supra, appellant asserts "the evidence * * * fails to support even a strong suspicion that appellant participated in a conspiracy as charged." We are not so persuaded. A careful and thorough review of the record indicates that there was substantial evidence from which the jury could legitimately infer that there was a conspiracy between National and other out-of-state dairies to cause a price war with the dual purpose of (a) forcing Meyer Sanitary Dairy to withdraw the 13% discount offer made to the chain of Milgram Stores, which was one of National's largest accounts in Kansas City, and (b) narrowing the price differential between gallon jugs and paper half gallons. It is well settled that:

> "No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circum-

stances as well as in an exchange of words." American Tobacco Co. v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

See also Johnson v. J. H. Yost Lumber Co., 117 F.2d 53, 57 (8 Cir. 1941); Esco Corp. v. United States, 340 F.2d 1000 at 1007 (9 Cir. 1965), where the court pertinently observed:

> "While particularly true of price-fixing conspiracies, it is well recognized law that any conspiracy can ordinarily only be proved by inferences drawn from relevant and competent circumstantial evidence, including the conduct of the defendants charged. * * * A knowing wink can mean more than words."

In addition to statements made by gallon jug operators and officials of the out-of-state dairies, it appears without dispute that during the indictment period there were at least six meetings or conversations between National officials and officials of one or several out-of-state dairies at which prices, Meyer Sanitary Dairy's discount offer to Milgram, or gallon jug differentials were discussed. The record also indicates that National supplied some proposed price lists to the out-of-state dairies and informed them of intended price changes. Significantly, price changes were always simultaneously and uniformly effected by National and the out-of-state dairies. Further detailing of the evidence is not required. It is abundantly clear that the jury's verdict under this count does not rest upon mere suspicion but rather upon substantial probative evidence.

*Count 13.*

This count, as supplemented by the Bill of Particulars, charged that National, from July 14, 1958 through August 27, 1958, sold milk in the Greater Kansas City market at "unreasonably low prices" for the purpose of destroying competition; that National utilized the advantages it possesses because it operates in a great many different geographical localities, to finance and subsidize a price war against the small competing dairies by intentionally selling milk at prices below its cost.

Here, the basic controversy is whether appellant, during the period of time covered by this count, sold its milk "below cost." The answer depends upon the meaning of the term "below cost." Appellant contends that a below cost sale is one made at a price lower than direct cost, i. e., raw material (milk), processing and container costs. The Government disagrees and asserts that a below cost sale is one made below fully distributed cost, which includes the cost of production, plus the additional allocated delivery, selling and administrative costs.

This precise question was not settled by the Supreme Court when it decided that § 3 of the Robinson-Patman Act, which makes it a crime to sell goods at "unreasonably low prices for the purpose of destroying competition or eliminating a competitor," is not unconstitutionally vague or indefinite, as applied to sales made *below cost* and with specific intent to destroy competition. United States v. National Dairy Products Corp., supra.

The Court was careful to state that its opinion was not to be construed as a categorical denouncement of every sale below cost. It recognized that certain business exigencies could justify such a practice. It announced that "[i]n proscribing sales at 'unreasonably low prices for the purpose of destroying competition or eliminating a competitor' we believe that Congress condemned sales made below cost *for such purpose*." (Emphasis supplied). Id., 372 U.S. at 34, 83 S.Ct. at 599. And "[w]hether 'below cost' refers to 'direct' or 'fully distributed' cost or some other level of cost computation cannot be decided in the abstract." Id. at 34, 83 S.Ct. at 599.

Although the Court tacitly recognized the difficulties inherent in placing reasonable boundaries on its holding, it stressed the need for a "predatory intent" in connection with the sale of goods below cost.

■ We have carefully studied National Dairy Products and conclude that it teaches: (1) that liability under § 3 may be imposed when the following elements are present; (a) sales at prices below some level of cost, and (b) intent to destroy competition or eliminate a competitor; (2) that the question whether sales are "unreasonably low" so as to impose liability under § 3 must be determined on the facts of each case—on an ad hoc basis; and (3) that the predatory or competitive nature of the seller's price, rather than theoretical cost considerations, is the real index of its legality. The question resolves itself into one of intent and purpose, not a choice of accounting methods. See also Rowe, "Price Discrimination Under the Robinson-Patman Act," p. 466; Ben Hur Coal Co. v. Wells, 242 F.2d 481 (10 Cir. 1957); Hershel California Fruit Products Co. v. Hunt Foods, Inc., 111 F.Supp. 732, 734 (1953); F. & A. Ice Cream Co. v. Arden Farms Co., 98 F.Supp. 180, 189–190 (1951).

■ Guided by the foregoing principles, we have no great difficulty in concluding that even though appellant made no sales below *direct cost* during the period of time covered by Count 13, the question whether it violated § 3 by selling below *fully distributed cost* was, in view of all the facts and circumstances, one to be resolved by the jury under proper instructions. Appellant, a nation-wide corporation, with immense financial resources, was able to, and did, make sales in July and August, 1958, in the Greater Kansas City market considerably below its fully distributed costs. National's operating statement shows that in July and August its losses in that market, computed on the basis of fully distributed costs, were over $46,000 and $73,000, respectively. Of course, such below cost sales were not sufficient, standing alone, to subject National to the sanctions of § 3. It was incumbent upon the Government to offer evidence that such below cost sales were concomitant with a predatory intent. And, contrary to appellant's claim, there was evidence from which the jury could, and did, find that appellant's practices were designed to destroy competition or eliminate a competitor. We hold that the district court properly submitted this count to the jury.

*Grand Jury Minutes.*

The Government called as witnesses persons who had been officers and employees of National or of co-conspirator corporations. During direct examination some of these witnesses indicated a tendency to forget, or an inability to recall, pertinent facts. The first occurrence of this nature took place during the direct examination of the Government's third witness, John Flanagan, the general sales manager for Sealtest Foods (a division of National) in Kansas City, Missouri. Upon request of the Government attorney for permission to use the grand jury transcript, or minutes, to refresh the witness' recollection, a lengthy conference ensued in chambers. In this conference the court directed that grand jury testimony be used in accordance with the following guidelines: (1) that Government counsel would "make its trial inquiry in substantially the same language as the question was asked the witness before the grand jury * * *;" (2) that Government counsel would mark in advance all of a witness' testimony relating to the topic to be refreshed, and designate specifically the questions in the transcript that the Government contemplated asking; (3) that the court would determine whether the questions that the Government intended to ask "would reasonably have the effect of refreshing the particular witness' memory;" and (4) that Government counsel themselves would read the grand jury transcript but not "in an accusatory manner" and without histrionics, and "if counsel inadvertently became enthusiastic about the manner and the tone in which they would utilize this testimony * * *," the trial judge would conduct the examination himself. Also, the witnesses would not be permitted to examine their prior testimony.

Counsel for National and Wise, apparently recognizing that grand jury min-

utes, under proper circumstances, may be used for the purpose of refreshing the recollection of witnesses, offered no objection to the procedure envisioned by the court. They did, however, move unsuccessfully for the privilege of examining the portions of the grand jury transcript which the Government intended to use. Neither does appellant, on this appeal, dispute that the Government was entitled to use the grand jury transcript for refreshment purposes. Rather, it contends that the court permitted Government counsel to use the grand jury testimony for impeachment purposes and as substantial evidence and, therefore, that the court erred in denying its motion to inspect the transcript.

■ It is fundamental that grand jury proceedings are cloaked with a veil of secrecy. "Grand jury testimony is ordinarily confidential." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 233, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940); United States v. Johnson, 319 U.S. 503, 513, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943); Beatrice Foods Co. v. United States, supra. This "indispensable secrecy of grand jury proceedings," United States v. Johnson, supra, at 513, 63 S.Ct. at 1238, may be disregarded only when there is a compelling necessity—when the need outweighs any countervailing policy. United States v. Proctor & Gamble Co., 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400, 79 S.Ct. 1237, 3 L.Ed. 2d 1323 (1959). The inspection of grand jury minutes and the use of grand jury testimony have been permitted for the purpose of refreshing witnesses' recollections. United States v. Socony-Vacuum Oil Co., supra, (in which there were ninety instances when the Government used grand jury testimony to refresh recollection of witnesses); Cox v. United States, 284 F.2d 704, 706 (8 Cir. 1960). No iron-clad rule requires that counsel for the defense be shown the grand jury transcript where, as here, it is not shown to the witnesses and where, as here, an appropriate procedure is adopted and followed to prevent its improper use. United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 233, 60 S.Ct. 811. In the final analysis, the question whether disclosure should be permitted is one addressed to the sound discretion of the trial court. Rule 6(e) F.R.Cr.P.; Pittsburgh Plate Glass Co. v. United States, supra, 360 U.S. at 399, 79 S.Ct. 1237.

■ However, error would result when the prior testimony is used as substantial evidence, United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 234, 60 S.Ct. 811; Cox v. United States, supra, 284 F.2d at 708, or when it is used for impeachment purposes, if the defendant is denied the right to inspect such prior testimony, United States v. Cotter, 60 F.2d 689 (2 Cir. 1932); cf. Continental Baking Co. v. United States, 281 F.2d 137, 146-148 (6 Cir. 1960); or when the refreshing material is deliberately used for purposes not pertinent to the issues to arouse the passions of the jurors, so that an objective appraisal of the evidence is unlikely. United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 234, 60 S.Ct. 811.

■ The record does not support the argument that the grand jury testimony was used for impeachment purposes or as substantial evidence and no objection of either nature was made during the trial. Appellant's failure to object on this ground would justify us in declining to consider this allegation of error. Rule 51 F.R.Cr.P.; Isaacs v. United States, 301 F.2d 706, 734-736 (8 Cir. 1962); Cox v. United States, supra, 284 F.2d at 709.

We have nonetheless considered the contention on its merits. Use of the grand jury testimony was limited to the stated purpose of refreshment, in strict conformity with the court's instructions. The court took every precaution to limit the jury's consideration of the evidence. Thus, when the question arose, the court explained to the jury:

"The important thing for the jury to keep in mind is that whatever

document may be used to refresh a witness' recollection, whether it is a telephone book, whether it is a letter that he may have written, whether it is transcribed testimony before a grand jury, the particular document that is used for that purpose is not to be considered by you as affirmative evidence in this case. It is merely used for the purpose of refreshing the witness' recollection. The witness' recollection may be refreshed, and if it is, he will say so."

The jury was similarly reminded as the trial progressed, and finally this instruction was given:

"You will recall that there were several occasions when some testimony taken before the grand jury or before a Congressional Committee was read to a witness for the purpose of refreshing his recollection. Such testimony is not evidence and the only purpose in having it read was to attempt to revive or refresh the memory of the witness."

In summary, no judicial abuse of discretion has been demonstrated.

Appellant claims that yet another error arose from the use of the grand jury testimony.

■ Government counsel furnished the court, but not appellant's counsel, with memoranda, before the examination of the first witness whose grand jury testimony was used for refreshment purposes. Here, appellant takes the position that "[n]ot until perfection of this appeal did [it] learn that the 'citations' furnished to the court * * * included a legal memorandum, and * * material other than citations to the

grand jury transcript." [6] Appellant's claim of error is that the *"ex parte* 'refreshment' memoranda together with its *ex parte* legal memorandum were calculated to," and "actually did, influence the court's rulings both on points of law and on evidence, adversely to appellant."

We are not impressed with the urgency of this contention. The first section of the memorandum contains a fair and accurate exposition of the law relating to the secrecy of grand jury proceedings, the use of grand jury testimony for refreshment purposes, the discretion of the trial court when grand jury testimony is used for refreshment purposes, and the right of the defense to inspect. How this legal data prejudiced appellant is beyond our comprehension. It is clear from the conference relating to the use of the grand jury testimony that counsel for appellant were fully cognizant of all legal principles stated in the memorandum. Moreover, no claim is now made that the legal memorandum contained any misstatements of the law.

The second section of the memorandum contains the names of eleven witnesses who testified before the grand jury, whom the Government expected to call as witnesses in the trial. It stated the facts that the Government hoped to elicit from the witnesses, the page reference to the specific material Government counsel intended to read, page references to other material relating to the same subject, and short statements explaining the context of the material.

Again, we are unable to find any prejudicial material in this section of the memorandum. It is evident that the memorandum was designed to aid the court in familiarizing itself with the

---

**6.** The record belies appellant's assertion that it was uninformed as to the contents of the memoranda until the appeal was perfected. Early in the trial, immediately after the Government had called a witness, the court, out of the hearing of the jury, stated to counsel:

"In accordance with our practice on the Grand Jury notes, the Government has handed me a memoranda of some nine points."

The court then elaborated upon three of the points and gave specific instructions to Government counsel in regard to use of the witness' grand jury testimony for refreshment purposes. Counsel for the defense made no claim of surprise nor request to examine the memoranda referred to by the court.

grand jury transcript, prior to refreshment. According to statements made by the judge, the memorandum accomplished this purpose. But nothing emerges from the record to furnish any foundation for appellant's assertion that the memorandum "actually did influence the court."

*The Court's Charge.*

Appellant's numerous contentions of error are presented in reference to four specific parts of the instructions: (a) the summarizing and outlining of the evidence; (b) the instructions on the Sherman Act counts; (c) the instructions on the Robinson-Patman Act counts; and (d) the "general" charge to the jury.

*Summary and Outline of the Evidence.*

Appellant asserts that the court summarized and outlined the allegations of the different counts and the evidence favorable to the prosecution but did not similarly summarize and outline appellant's contentions and the evidence favorable to it; that the summary was one-sided and, therefore, prejudicial to appellant.

 A Federal Judge, in a criminal case, is more than a moderator or umpire. He is not a "mere automatic oracle of the law, but a living participant in the trial, and so as the limitations of his position permit should see that justice is done." Rudd v. United States, 173 F. 912, 914 (8 Cir. 1909). The judge may "assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important; and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their deter-

mination." Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). See also, Franano v. United States, 310 F.2d 533, 537 (8 Cir. 1962); Northcraft v. United States, 271 F.2d 184, 188–189 (8 Cir. 1959).

 To be sure, the judge must not become an advocate for either party. Stoneking v. United States, 232 F.2d 385, 389–390 (8 Cir. 1956), and cases there cited. "[S]ince a trial judge's influence upon a jury is necessarily of such great magnitude, [he] should exercise care and discretion in expressing an opinion so as not to mislead or, in effect, to destroy the jury's right as the sole arbiters of all fact questions." Franano v. United States, supra, 310 F.2d at 537, and cases there cited. As stated by Judge Hand, "There is no inevitable necessity in a criminal case that the judge shall state the evidence in his charge— 'marshal' it, as it is called in England." United States v. Gillilan, 288 F.2d 796, 798 (2 Cir. 1961). If the court does undertake to review the facts for the purpose of aiding the jury, it must do so in fairness to both sides. Cline v. United States, 20 F.2d 494, 496 (8 Cir. 1927); Boatright v. United States, 105 F.2d 737, 739–740 (8 Cir. 1939), and Benes v. United States, 276 F.2d 99, 103–104 (6 Cir. 1960).

The court's charge was exhaustive and comprehensive. Almost five hours were required to deliver it. Apparently the court had prepared an outline of all the pertinent portions of the evidence which it felt should be called to the jury's attention. As the final argument of counsel progressed, the court eliminated from its outline evidentiary matters that were covered by counsel.[7]

 We, of course, must consider the instructions as a whole in deter-

---

7. At the outset of the instructions, Judge Oliver informed the jury that:

"* * * the arguments of counsel in this case focused and directed attention to many of the facts and circumstances upon which their respective arguments were based, and the specific references to times and to places and persons and events has reduced greatly the amount of time that will be required by me so far as making any outline of the evidence to you is concerned. * * * this jury received an excellent review of all the evidence by the highly competent counsel representing all the parties in this case."

mining whether a particular statement conveys an erroneous impression to the jury. Beatrice Foods Co. v. United States, supra, 312 F.2d at 47; Northcraft v. United States, supra, 271 F.2d at 189; Stoneking v. United States, supra, 232 F.2d at 389.

We have carefully read the entire charge and have focused our attention particularly upon those portions which appellant claims exceeded the bounds of propriety. The judge did not emphasize and unfairly comment upon evidence favorable to the Government. The court expressly informed the jury:

"I want to say in connection with the specific counts at this time that I do not intend to exercise the power vested in a trial judge in the Federal system to make any comment upon the evidence or upon the testimony of any particular witness. That is your job. It is your job to make judgment of the facts in this case. I will make reference to the fact that my outlines do not constitute a comment or indicate in any way feeling that I may have as to the testimony of any witness that has been on that witness stand."

The judge assiduously adhered to his stated intention. He refrained from commenting upon, interpreting or drawing any conclusions from the evidence. It is true that, in instructing on each count, the judge did, upon occasion, direct the jury's attention to certain evidence and he did remind the jury of certain incidents which were established by undisputed evidence, but we find no unfairness in his statements. At no time did the judge become an advocate for the Government or attempt to usurp the function of the jury. On the contrary, at the outset of the charge, the jurors were told: " * * * you are the sole judges of the facts in this case. * * * You as jurors are the sole judges of the credibility of the witnesses and the weight their testimony deserves." After directing attention to a meeting attended by defendant, Wise, the court instructed: "You must determine what

was said, who said it, determine what testimony you are going to believe. * * These are the types of questions relating to the conflict in the evidence that you must decide in your determination of the factual issues presented by the 1957 market situation relating to Count 11." In concluding its charge, the court stated: "Remember that our quest is for truth and to see that justice be done. Justice is not done unless you follow and apply the law to the facts as you find them in this case."

We are convinced that the portions of the instructions under attack comport with the legal standards enunciated, supra. The fact that appellant was acquitted on Counts 14 and 15, in regard to which the court's references to the evidence were no different, belies the assertion of onesidedness and prejudice. The acquittal on these counts demonstrates that the jury was fully aware of its responsibility and that it decided the case in accordance with its view and understanding of the evidence.

*Instructions on Sherman Act Counts.*

Relying principally upon Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911 (5th Cir. 1952), and Poller v. Columbia Broadcasting System, Inc., 109 U.S.App.D.C. 170, 284 F.2d 599 (1960), rev'd on other grounds, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), appellant asserts error because the court refused to instruct that a corporation cannot be found guilty of conspiring with its own officers, employees or agents. The short answer to this is that the instructions that were given included the matter covered by the refused instruction. In clear and unambiguous language the court required the jury to find, as a prerequisite to any verdict of guilty, that the defendant or defendants had conspired with others—competing dairies or distributors. That, of course, was the theory upon which the case was tried. The Government never contended that the crimes charged rested upon a conspiracy between National and its own employees. Inasmuch as the instructions given prop-

erly declared the law, no prejudice resulted from the failure to give the offered instruction.

Appellant further contends that the court erred in instructing the jury that a mere "unity of purpose" would justify the finding of an unlawful conspiracy. A sufficient answer is that no exception was taken, as required by Rule 30, F.R.Cr.P. Even if we were to assume (which we do not) that the statement was erroneous, the error was not so prejudicial as to require application of Rule 52(b), F.R. Cr.P. (plain error). The fact is that the instructions which submitted the Sherman Act counts, considered in their entirety, correctly declared the law and provided a proper guide for the jury in its deliberations.

Appellant advances other complaints of a minor nature about the instructions as they relate to the Sherman Act counts. These complaints have been considered and are found to be lacking in substance.

*Instructions on the Robinson-Patman Act Counts.*

Appellant attacks the charge which submitted the Robinson-Patman Act counts on several grounds. We have carefully considered all of them.

It is manifest from statements made by Judge Oliver, during the course of his consideration of the over-all charge that he intended to give, that he was thoroughly familiar with the Supreme Court's opinion in National Dairy Products, supra. It is likewise evident that the judge carefully framed the instructions to comply with the principles enunciated by the Supreme Court. Thus, at the outset of the charge, he instructed:

"When the Congress passed Section 3 of the Robinson-Patman Act, it condemned sales made below cost if it should be determined as a matter of fact that such sales were made, in the language of the statute, at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.

\* \* \* \* \* \*

"The Congress required proof of a predatory intent on the part of one charged with violation of Section 3 of the Robinson-Patman Act.

"The law requires that proof of such an intent, proof of an intent to sell at unreasonably low prices in furtherance of a purpose of destroying competition, be made beyond a reasonable doubt. Basically, Section 3 of the Robinson-Patman Act is directed at business conduct designed to destroy competition.

"Now, of course, neither Section 3 of the Robinson-Patman Act nor any other law of Congress can be evaluated or applied in the abstract. It is quite clear that Section 3 is not to be applied to hold that every sale that is made below cost is to be determined to be a sale made at an unreasonably low price for the purpose of destroying competition or eliminating a competitor."

The jury was further specifically instructed that, as a prerequisite to a verdict of guilty on each of the Robinson-Patman Act counts, they were required to find "beyond a reasonable doubt that National sold below cost and that such prices were unreasonably low for the purpose of destroying competition," and the jury was also required to make "a finding of predatory intent beyond a reasonable doubt and find that the sale below cost was unreasonably low beyond a reasonable doubt."

Appellant complains in particular because the court submitted the fully distributed cost theory to the jury. Attention is focused upon Count 13, the contention being that, as to this count, "it's [National's] challenged price in Kansas City was *above* its cost of production. \* \* \* Accordingly, as to this count there was a clear failure of proof of an essential element of the offense charged \* \* \*." The cost issue was submitted in the following manner:

"In this connection, the Government urges that the sales were un-

reasonably low because they were below National's total costs, calculated on an average unit basis for that product, usually a half gallon of homogenized milk in a paper container * * *. Defendants dispute this and contend that their costs must be limited to the cost of raw milk plus the cost of paper containers. It is for you to decide whether or not the prices National charged were below cost and were unreasonably low. * * * Of course, the question of whether or not the low price charged is unreasonable will also depend upon the purpose behind it about which I have attempted to instruct you fully."

We do not believe that there was error in this submission. Although appellant's price, relating to Count 13, was above direct cost, concededly, it was below fully distributed cost, and since we determined, supra, that the record contains ample evidence of predatory intent, it was a fact question, properly submitted to the jury, whether sales below *fully distributed* costs were "unreasonably low" and were made for the purpose of destroying competition or eliminating a competitor.

*General Charge.*

Finally, appellant contends that the court erred in its "general" charge to the jury.

The assertion that the court did not advise the jury that appellant's guilt must be established beyond a reasonable doubt is patently frivolous. Throughout the charge, the jury was instructed as to the standard to be applied. Indeed, at the conclusion of the charge, Government counsel complained that "the court has overly stressed the reasonable doubt aspect in the giving of its instructions * * *."

The instruction relating to liability of National for the acts and declarations of its agents properly declared the law. Egan v. United States, 137 F.2d 369 (8 Cir. 1943), cert. denied 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474 (1943); Continental Baking Co. v. United States, supra.

Likewise, the court properly instructed that National was responsible for the acts of Chapman Dairy and its agents prior to December 31, 1956, if the jury further found that National dominated and controlled the operations of Chapman. We have heretofore demonstrated at some length that there was substantial evidence to support a finding that Chapman's operations were in fact completely dominated and controlled by National.[8]

Further discussion of the alleged errors in the instructions would add nothing. It is sufficient to say that a studious examination of the instructions, in context, fails to reveal any prejudicial defects therein.

*The Court's Attitude.*

Appellant asserts "the Court's attitude was highly prejudicial," and "[w]hile appellant does not contend that the trial court intentionally prejudiced its defense, the judicial acts * * * described were in fact 'calculated' to, and did, deprive appellant of a fair trial."

The persistence and zeal with which counsel present the claims of prejudicial conduct contrasts sharply with their failure to exhibit concern about the asserted unfairness during the trial. The undisputed fact is that not once in the protracted trial, requiring a countless number of rulings by the court, did counsel even intimate that they believed appellant was the object of judicial prejudice.[9] Cf. Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46, 55–56 (8 Cir. 1958).

8. See our consideration of appellant's challenge to sufficiency of evidence to support conviction under Count 1.

9. Appellant did object to the court's ruling during cross-examination of witness The-

no. The "Theno incident" is set out in full in the trial court's opinion denying the motion for new trial at 231 F.Supp. 663 (1964).

The issue of prejudice was first raised in the motion for new trial. Yet, in oral argument on motion, Mr. Chadwell, chief counsel for appellant, stated:

"I want to repeat very sincerely, Your Honor, what Mr. Purcell has said, that is, by anything that we have said in our briefs or anything that he has said or anything I will say, we want to make very clear in the record that we do not wish Your Honor to understand that we are in any way indicating a belief that Your Honor was other than sincere and honest in your rulings from beginning to end in this trial. We don't think that at any time you were out to get us or out to get the defendants, but you tried to preside in this case fairly. We don't say anything else, and I want the record to make that clear."

As reference to Judge Oliver's post-trial opinion, 231 F.Supp. 663 (1964), will disclose, he considered the claims of judicial unfairness at length and demonstrated beyond any doubt that appellant's assault upon his judicial demeanor is wholly unwarranted and completely without basis.

The failure to object or take appropriate exceptions notwithstanding, we have examined the contentions in light of the plain error rule [Rule 52(b), F.R.Cr.P.], and find that, without exception, they are lacking in substance. Judge Oliver presided over the long and hard-fought trial with judicial poise and commendable fairness. This record simply does not lend any support to claims of judicial intemperance or irritation. The judge did not limit or restrict appellant's right to examine witnesses; he did not disparage appellant's defense; his questioning of witnesses was not prejudicial, and his rulings on evidentiary questions did not favor the Government. In short, we conclude that appellant's claim of judicial misconduct borders on the frivolous.

*Rulings on Evidence.*

Appellant lists three basic contentions of error in regard to the reception of evidence: (1) that hearsay declarations were improperly admitted; (2) that two hearsay documents were improperly admitted; and (3) that evidence of appellant's corporate size and market power was improperly admitted.

*Hearsay Declarations.*

 It is well settled that the statements of conspirators are admissible against all members of a conspiracy so long as there is other independent evidence showing that there was, in fact, a conspiracy between the declarant and the others. Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249, 38 S.Ct. 65, 62 L.Ed. 260 (1917); Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 116–117, 68 S.Ct. 947, 92 L.Ed. 1245 (1948). The trial court properly instructed the jury as to the evidentiary worth of such statements.[10]

Appellant insists that, while statements of defendant co-conspirators may be admissible, statements of non-defendant co-conspirators are not admissible. This contention has been rejected by the case of Clune v. United States, 159 U.S. 590, 593, 16 S.Ct. 125, 40 L.Ed. 269 (1895) and, more recently, by the case of

---

10. The judge's instruction to the jury was in part as follows:

"I instruct you that acts or declarations of any alleged co-conspirator, or conspirators, may not be considered by you until and unless you find beyond a reasonable doubt that a combination and conspiracy had in fact been formed and the alleged conspirator or conspirators are identified with it.

\* \* \* \* \*

"It would be a matter of first order in your consideration of any of the separate and particular Sherman Act counts for you to inquire in each instance whether or not the Government has proven that a particular combination and conspiracy existed by independent evidence and beyond a reasonable doubt before you are warranted in considering any actions or declarations by any alleged co-conspirator, purportedly made pursuant to that particular conspiracy."

Esco Corp. v. United States, supra, 340 F.2d at 1008–1009.

Appellant also objects to the admission of statements made by others, neither co-conspirators nor employees. We are convinced, after careful consideration of the testimony complained of, that the statements were properly admitted and did not fall within the hearsay exclusionary rule.

*Hearsay Documents.*

Appellant, on the grounds that they are "rank hearsay," claims that the trial court erred in admitting two of the Government's exhibits. The record shows, however, that a proper foundation for their admission was laid. Even assuming, which we do not, that two documents had been improperly admitted, it is difficult to comprehend that, of the more than 600 exhibits received, two documents containing facts which were substantiated by proper testimony of many witnesses, could have been prejudicial to appellant.

*Evidence of Appellant's Corporate Size and Market Power.*

██ Appellant contends that evidence of its corporate size and market power was irrelevant, immaterial and prejudicial. While it is well established that size is not an element of the offense of conspiracy under § 1 of the Sherman Act, corporate size can be relevant, especially when conspiracy to cut prices is charged. United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 239, 60 S.Ct. 811. However, the trial court properly instructed the jury that corporate size and power was not to be considered as evidence of conspiracy under the Sherman Act counts. Appellant was not prejudiced nor was the admission of evidence of its corporate size irrelevant and immaterial under the Sherman Act counts.

Evidence of corporate size and power was even more relevant to the Robinson-Patman Act counts. In United States v.

National Dairy Products Corp., supra, the Supreme Court quoted from Moore v. Mead's Fine Bread Co., 348 U.S. 115, 120, 119, 75 S.Ct. 148, 99 L.Ed. 145 (1954):

" 'Congress by the Clayton Act and Robinson-Patman Act barred the use of interstate business to destroy local business' through programs in which 'profits made in interstate activities would underwrite the losses of local price-cutting campaigns.' " (372 U.S. at p. 34, 83 S.Ct. at p. 598)

The record discloses that National's Kansas City milk division lost a substantial sum of money during the period charged in the indictment. Evidence of National's over-all size and financial power was directly relevant to show National's ability to underwrite and subsidize any local plant losses.

Other complaints about the admission and exclusion of evidence are made by appellant. The complaints are too numerous to be discussed individually without greatly extending this already lengthy opinion. Suffice it to say that we have carefully examined each of them and conclude that the court's rulings were not prejudicial.

In conclusion, the following observations are relevant. Both the Government and appellant were represented in the district court and on appeal by highly competent and skilled advocates. This prosecution has produced a history of every conceivable motion and numerous legal memoranda. The case has twice been to the Supreme Court. From the filing of the indictment to the filing of the notice of appeal fourteen volumes of "pleadings" have been amassed. In such a hotly contested and protracted legal battle, mistakes do occur. "The human element cannot be eliminated from lawsuits." But, as always, the crucial question is, were there any mistakes or errors of a prejudicial nature? We conclude there were not.

Affirmed.