**CARL ZEISS STIFTUNG, doing business under the name and style of Carl Zeiss, and Zeiss Ikon, A.G., Plaintiffs,**

v.

**V.E.B. CARL ZEISS, JENA; Steelmasters, Inc.; Ercona Corporation; Exakta Camera Company, Inc.; and Camera Specialty Company, Inc., Defendants. Carl Zeiss, Inc., Additional Defendant on Counterclaim.**

No. 62 Civ. 850.

United States District Court
S. D. New York.
March 12, 1969.

Milbank, Tweed, Hadley & McCloy, New York City, for plaintiffs and Carl Zeiss, Inc.; William E. Jackson, Isaac Shapiro, Patrick Owen Burns, Walter J. Derenberg, of Von Maltitz, Derenberg, Kunin & Janssen, New York City, of counsel.

Harry I. Rand, New York City, for defendants V. E. B. Carl Zeiss Jena, Steelmasters, Inc. and Ercona Corp.; Donald E. Nawi, Botein, Hays, Sklar & Herzberg, New York City, of counsel.

### Decision with Respect to Antitrust Misuse Defense

MANSFIELD, District Judge.

On November 7, 1968, the Court filed its decision and findings of fact with respect to plaintiffs' claims against defendants in the above-entitled action, holding that the plaintiff Carl Zeiss Stiftung has the sole and exclusive right to the use of the Zeiss name and trademarks in dispute and that plaintiff Zeiss

Ikon A. G. has the sole and exclusive right to use the Zeiss Ikon name and mark, D.C., 293 F.Supp. 892. The Court further held that defendant V. E. B. Carl Zeiss, Jena, Steelmasters, Inc. and Ercona Corporation have, since at least 1953, infringed plaintiffs' trademarks, unfairly competed with plaintiffs through the use of various names and marks found to be similar to those owned by plaintiffs, and, in violation of § 43 (a) of the Lanham Act, falsely described and designated the origin of goods imported by them into the United States. All defenses except the antitrust misuse defense asserted by defendants were dismissed, and subject to resolution of that defense, the Court held that plaintiffs were entitled to enforcement of their rights in the marks and tradenames against defendants.

Following a hearing on December 4, 1968, we ordered trial of the antitrust defense to be severed from trial of the antitrust counterclaim and damage issues, and on February 25, 26 and 27, 1969, the antitrust misuse defense was separately tried to the Court. After careful review and appraisal of the testimony and documentary evidence received by the Court, we conclude that the antitrust misuse defense must be dismissed.

As and for their "antitrust misuse" defense, defendants assert that plaintiffs and their American subsidiary corporations, Carl Zeiss, Inc. (Zeiss, N. Y.) and Zeiss Ikon Voigtlaender of America, Inc. (ZIV, Inc.) have used their Zeiss trademarks in various ways to violate the antitrust laws in the United States, including the following:

(1) Combining with American distributors and franchise dealers to maintain prices established by Zeiss, N. Y. and ZIV, Inc. for Zeiss goods;

(2) Restricting sale of Zeiss goods by certain dealers to limited territories;

(3) Restricting sales of Zeiss goods by dealers to certain customer classes;

(4) Tying in the sale of certain Zeiss goods to purchase of other Zeiss products;

(5) Unlawful price discrimination;

(6) Precluding distributors from selling competitive goods;

(7) Submission of artificial bids to governmental agencies; and

(8) Organizing ZIV, Inc. to eliminate competition in the sale of certain Zeiss Ikon products.

Defendants further allege that plaintiffs' antitrust misuse of the Zeiss trademarks precludes entry of judgment in this action in favor of plaintiffs.

At the outset it is important to define the material issues raised by the foregoing antitrust misuse defense, especially since plaintiffs, prior to trial of that defense, moved pursuant to Rule 12(f), F.R.Civ.P., to dismiss the defense as a matter of law. Plaintiffs' argument in support of that motion goes essentially as follows: prior to the enactment of the Lanham Act in 1946, antitrust misuse did not bar enforcement of a valid trademark. The Lanham Act then provided that ownership of a federally registered trademark would become incontestable after five years of registration unless it was subject to certain defenses, including misuse of the trademark in violation of the antitrust laws, in which event such registration would not be deemed conclusive evidence of ownership. Therefore, argue the plaintiffs, the sole effect of the antitrust misuse defense is to defeat the incontestability that would otherwise attach to registration of the trademarks under the Lanham Act, and the defense cannot be used to preclude enforcement of the trademarks in the present case for the reason that plaintiffs have already independently established their ownership of the marks to the satisfaction of the Court.

Both the express language of § 33(b) (7) of the Lanham Act and its legislative history reveal strong support for plaintiffs' contention that the intent and effect of the Act is merely to make the

defense of antitrust misuse available to defeat the conclusive evidentiary force that would otherwise attach to a trademark certificate under the Act. The relevant portion of the section provides:

"The certificate [of trademark registration] shall be conclusive evidence of the registrant's exclusive right to use * * * except when one of the following defenses or defects is established:

ⁿ * * * * * *

"(7) That the mark has been or is being used to violate the antitrust laws of the United States." (15 U.S. C. § 1115(b) (7) )

The principal author of the Act, Representative Lanham, in explaining the Senate-House Conference Report with respect to the Act, stated:

"However, section 33(b) contains seven exceptions to the rule that the certificate of registration shall be conclusive evidence of the rights of the registrant even where the provisions of section 15 have been met. Some doubt has been expressed on the following points:

"First. Do these seven exceptions, including the amending paragraph (7) with reference to the violation of the antitrust laws of the United States, lay down substantive rules of law or substantive defenses which go to the validity and enforceability of the mark, or do they relate only to the weight of evidence to be given to the certificate of registration?

"Second. What is the meaning of the words 'used to violate the antitrust laws,' as found in paragraph (7) of paragraph (b) of section 33?

"It is clear from the language of the act and from the congressional history of the act as it is found in the hearings and reports that the seven 'defenses or defects' listed under paragraph (b) of section 33 are *intended to relate to and to affect the weight of the evidence to be given to the certificate of registration where the owner claims the benefit of the incontest-*

*able rule * * * but these seven paragraphs are not intended to enlarge, restrict, amend, or modify the substantive law of trademarks either as set out in other sections of the act or as heretofore applied by the courts under prior laws. A trade-mark registrant who is shown to have used his mark to violate the antitrust laws is denied the benefit of the rule that his certificate of registration is conclusive evidence of his right of ownership and his right to the exclusive use of the mark.* Under these circumstances, his certificate of registration is only prima facie evidence of his right and he must be prepared to carry the additional burden of proof as is necessary under the laws and statutes as they existed prior to the passage of this act. One of the valuable new rights created by the act is the incontestable right after 5 years' use of the mark and the corollary thereto that the certificate of registration is conclusive evidence of ownership and the right to the exclusive use of the mark. *This new and valuable right is denied to any trademark registrant who is shown to have used his mark to violate the antitrust laws, but this provision does not and is not intended to deprive the registrant of any rights he would possess or enjoy if this act were not enacted into law. Stated in other terms, proof of violation of the antitrust laws of the United States by a registrant in the use of his mark does not under this act destroy the validity of or the right of the registrant to continue to use the mark,* but it places on him a burden of proof in the event of litigation which others do not have to carry, by diluting the weight the court is to give to his certificate of registration as evidence of ownership and the right to use the mark. *This is the intent and effect and the only intent and effect of the seven subparagraphs of paragraph (b) of section 33.*" (Emphasis added) (92 Cong.Rec. 7524)

The same views were expressed by the managers of the bill in presenting the Senate-House Conference Report with respect to the bill. Senator Hawkes, one of the three Senate conferees, and Representative Lanham, one of the three House conferees, both read the following statement drafted by the managers of the bill in the House:

"Amendment No. 28: This amendment provides that the use of a registered mark in violation of the antitrust laws shall constitute a defense to a suit by the registrant. The House recedes with an amendment substituting the words 'to violate' for the words 'in violation of.' This amendment provides an additional defense to the conclusive evidence rule of a certificate of registration of a mark which has become incontestable under section 15. It does not and is not intended to enlarge, restrict, amend, or modify the substantive law of trademarks either as set out in other sections of this Act or as heretofore applied by the Courts. *The amendment does not and is not intended to affect the validity of the mark nor affect the right of the registrant to continue use or enforce his rights in the mark.* If it is established that a registrant has used or is using his registered mark, which has become incontestable, as the legal, causal, and efficient instrumentality to violate the antitrust laws of the United States, such registrant is denied the benefit of the rule that the certificate of registration is conclusive evidence of his exclusive right to use the mark. Under such circumstances, the certificate is only prima facie evidence of his exclusive right to use and he must be prepared to carry the additional burden of proof as though his mark had not become incontestable." (Emphasis added) (92 Cong.Rec. 7523)

The foregoing statements as to the scope and intent of the various defense provisions of the Lanham Act were affirmed by another conferee, Senator Pepper, upon submission of the Conference Report to the Senate, and the intent expressed by the authors has since been accepted by commentators. Note, The Besmirched Plaintiff and the Confused Public: Unclean Hands in Trademark Infringement, 65 Colum.L.Rev. 109, 114–115 (1965); Steed and Hunter, Trademarks Assignments and Restraints of Trade: The Maola Ice Cream Case, 45 T.M.R. 886 (1955); but see Handler, Trademarks and Antitrust Laws, 38 T.M.R. 387, 394–395 (1948).

It is true that Senator Hawkes when commenting upon the Conference Report with which he expressed agreement added the following qualification with respect to § 33(b) (7):

"I should like to add that the exception is that when the trade-mark is used to violate the antitrust laws, then such violation of the laws can be used as a defense against one who sues for infringement.

"I should like to read this statement:

"This exception means, and should mean, that a trademark owner who sues another user for infringement must come into court with clean hands, and if he is using the mark to violate the antitrust law he is subject to be contested and to have his violation used as a defense." (92 Cong. Rec. 7636)

There are, furthermore, general statements by Senator O'Mahoney upon the floor of the Senate, 92 Cong.Rec. 7872, 7873, and by the Senate Committee on Patents, Sen. Rep. No. 1333, 79th Cong., 2d Sess., p. 2 to the effect that the use of a trademark to violate the antitrust laws is, by virtue of § 33(b) (7), a defense in an infringement suit. At best, however, these statements, while seemingly contrary to the more detailed written statements previously cited, are ambiguous as to the precise scope of the defense. In view of the plain language of the Act and the detailed and explicit statements of those primarily responsible for drafting it and managing its passage, we cannot accept the ambiguous

and general statements of Senator Hawkes, who expressly indicated his agreement with the more explicit statement of the House managers, Senator O'Mahoney and the Senate Committee on Patents as altering or enlarging in any way the intent and effect of the relevant provisions of the Act.

 Insofar as defendants here rest their antitrust misuse defense upon § 33 (b) (7) of the Lanham Act, therefore, the defense must be rejected. However, the limited purpose for which the defense may be invoked under § 33(b) (7) does not automatically call for dismissal of the defense in this case. Although the issue is not free from doubt, we believe that a court, in the exercise of its equity powers, may deny enforcement of a trademark on the part of one who has used that trademark in violation of the antitrust laws. We recognize that the forces favoring exercise of such power in a trademark suit are much weaker than those calling for its exercise in patent litigation, and that decisions upholding an antitrust misuse defense in the latter are not necessarily authoritative in the trademark field. See, for example, Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). The distinction arises from the fact that a patent represents a grant of a limited monopoly that in most instances would, absent its legalization by Congress, constitute an unlawful restraint of trade. The limited monopoly is granted in exchange for disclosure of the patented invention to the public so that it may be utilized in free competition upon expiration of the patent. A valid trademark, on the other hand, merely enables the owner to bar others from use of the mark, as distinguished from competitive manufacture and sale of identical goods bearing another mark, or even no mark at all, since the purpose of trademark enforcement is to avoid public confusion that might result from imitation or similar unfair competitive practices rather than to authorize restraints upon trade.

Thus, although misuse of a patent almost inevitably is accompanied by unlawful restraints, the opportunity for effective antitrust misuse of a trademark, as distinguished from collateral anti-competitive activities on the part of the manufacturer or seller of the goods bearing the mark, is so limited that it poses a far less serious threat to the economic health of the nation. As a result, it has been recognized that a sharp distinction must be drawn between the antitrust misuse defense in patent infringement suits, on the one hand, and its use in trademark suits, on the other. See Waco-Porter Corp. v. Tubular Structures Corp. of America, 222 F.Supp. 332 (S.D.Calif. 1963). Although we do not accept the view that the defense should be unavailable as a matter of law, see, e.g., Folmer Graflex Corp. v. Graphic Photo Service, 41 F.Supp. 319, 320 (D.Mass.1941), it is significant that in almost every reported instance where the antitrust misuse of a trademark has been raised as a defense, it has been rejected. In the great majority of such cases the evidence revealed the antitrust activities to be collateral and did not demonstrate that the trademark, as distinguished from collateral activities with respect to goods bearing the trademark, was itself being used as the prime and effective instrument to effectuate the antitrust activity. E.g., O. & W. Thum Co. v. Dickinson, 245 F. 609, 622–623 (6th Cir. 1917), cert. denied, 246 U.S. 664, 38 S.Ct. 334, 62 L.Ed. 928 (1918); Searchlight Gas Co. v. Prest-O-Lite Co., 215 F. 692, 697 (7th Cir. 1914); Prest-O-Lite Co. v. Davis, 215 F. 349, 351 (6th Cir. 1914); Coca-Cola Co. v. Gay-Ola Co., 200 F. 720, 726 (6th Cir. 1912), cert. denied, 229 U.S. 613, 33 S.Ct. 773, 57 L.Ed. 1352 (1913); Coca-Cola Co. v. Deacon Brown Bottling Co., 200 F. 105 (N.D.Ala.1912); Weyman-Burton Co. v. Old Indian Snuff Mills, 197 F. 1015 (S.D.N.Y.1912); Independent Baking Powder Co. v. Boorman, 130 F. 726 (D.N.J.1904).

"The difficulty, however, is that defendant does not allege that the mark is being used in violation of the anti-

trust laws. Instead, it charges the plaintiff with a boycott, with conspiring to establish retail price control, and with various other matters, which taken together constitute a claim that the plaintiff is violating the anti-trust laws in certain respects, but not that it is using the trade-mark to do so. Such a defense is insufficient in a trade-mark infringement case. See Vitagraph, Inc. v. Grobaski, D.C.W.D.Mich.1951, 46 F.2d 813, 814; cf. 15 U.S.C.A. § 1115." (Forstmann Woolen Co. v. Murray Sices Corp., 10 F.R.D. 367, 370 (S.D.N.Y. 1950) )

■ Since denial of a plaintiff's exclusive right to the use of his trademark is not essential to the restoration of competition, it is not enough merely to prove that merchandise bearing a trademark, however valuable the trademark, has been used in furtherance of antitrust violations. If this is all that were required, any antitrust violation in the distribution of such merchandise would result in a forfeiture of the trademark with a consequent unnecessary frustration of the policy underlying trademark enforcement. An essential element of the antitrust misuse defense in a trademark case is proof that the mark itself has been the basic and fundamental vehicle required and used to accomplish the violation. Although the burden of establishing such a direct misuse is a heavy one, it is not insuperable. For instance, in Phi Delta Theta Fraternity v. J. A. Buchroeder & Co., 251 F.Supp. 968 (W.D.Mo.1966), it was claimed that after a conspiracy between fraternities and others to monopolize the market in fraternity jewelry had failed, and the conspiracy could not be enforced against independent jewelry manufacturers and dealers, the fraternities began to register their insignia as trademarks for the very purpose of eliminating independent competition, and the court quite properly and understandably concluded that, if these allegations were proven, the trademarks were used as a causal instrumentality to violate the antitrust laws.

■ When the evidence in the present case is considered in the light of the foregoing principles, it reveals a complete failure to establish that plaintiffs used the Zeiss trademarks to violate the antitrust laws. The deficiency in proof lay in defendants' erroneous assumption that if they could show that the Zeiss trademarks were considered a valuable asset by dealers in Zeiss-manufactured products, and that merchandise bearing the Zeiss trademarks had been used in furtherance of collateral antitrust violations, the antitrust misuse defense would be established. As we have already noted, however, the law is to the contrary, and it requires more than proof of a collateral violation.

Unquestionably the Zeiss trademarks, when affixed to merchandise of the type manufactured by plaintiffs, have value because they identify the merchandise to dealers and retail customers as manufactured by Zeiss in West Germany according to its high quality standards, and we have already found that these various Zeiss trademarks have considerable value (page 3, decision filed Nov. 7, 1968). When defendants further offered to prove that the merchandise to which the marks were affixed was the subject of various collateral anti-competitive activities of the type alleged in the affirmative defense (all of which were vigorously denied by plaintiffs) and it appeared that proof with respect to such activities would be voluminous and necessitate a long trial, we, in the exercise of our discretion, directed defendants first to adduce the proof relied upon by them (1) to establish the alleged antitrust misuse of the Zeiss trademarks, as distinguished from collateral antitrust violations involving use of merchandise bearing the marks, and (2) to show that the plaintiffs should be held responsible for the alleged antitrust activities of Zeiss, N. Y. and ZIV, Inc. Defendants were not precluded, however, from offering any proof with respect to

alleged antitrust activities that appeared relevant to these two basic threshold issues.

The proof offered by defendants convinces us that dealers in Zeiss-manufactured merchandise have valued the opportunity to sell such merchandise not because of the trademarks but because of the reputation of the manufacturer. Viewing the evidence as a whole, including defendants' offers of proof, we do not find that the trademarks were a competent producing cause which made possible the alleged antitrust violations. There was no credible evidence, for instance, to the effect that if the Zeiss trademarks had been removed from the merchandise and some other identification affixed which would show its origin (such as a mark reading "Made by Zeiss, West Germany"), sales would decline or dealers and purchasers would refuse to buy the merchandise. Nor was there any proof that plaintiffs ever did deny, or threatened to deny, a dealer the right to use the Zeiss trademarks unless he consented to engage in the alleged antitrust activities, or any proof that defendants sought to tie in the use of the Zeiss trademarks with such activities. See, e. g., Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Nor was there any attempt to show that the trademarks were used as an instrument of unlawful price discrimination, such as by charging a different price for branded and unbranded instruments of like grade and quality. FTC v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966). There was no proof that the trademarks, as distinguished from the merchandise manufactured by plaintiffs, were ever even the subject of discussion with dealers, customers or anyone else. For instance, plaintiffs never threatened to withhold the right to use the trademarks from a dealer or distributor unless he assisted in anti-competitive activities. In contrast to the complete absence of evidence that the trademarks were used as a causal instrumentality in the perpetration of any antitrust activities,

there was proof that during some of the years when defendant Ercona was denied the use of the Zeiss trademarks (at the instance of the Office of Alien Property) in selling East German merchandise in the United States, its annual sales were higher than during earlier years when it used the Zeiss trademarks.

Some idea of the paucity and unconvincing nature of the proof offered by defendants is their heavy reliance on the testimony of Ben Rosenberg, an operator of a very small curiosity shop in Manhattan, who deals, among hundreds of other unrelated items, in used microscopes, cameras and telescopes. In response to a question from the Court, he testified that unless he could be assured of the Zeiss trademarks, he would not accept a Zeiss dealership. However, after observing his demeanor and giving careful consideration to his entire testimony, we believe that it is virtually worthless on the fundamental issue. He is essentially a dealer in used merchandise (all but 2% of his sales are used goods) and as such would, of course, be more interested in proof of identification of a used item as Zeiss-made than would be an authorized Zeiss dealer who is recognized by the public and has the right to advertise himself as such. Furthermore, his testimony is at best speculation, since he has never been a Zeiss dealer and hardly appears to enjoy any prospect of becoming one, since he is essentially engaged in an unrelated business, namely the sale of used art goods, bric-a-brac, paintings and the like (amounting to only $50,000 annually, of which only a small percentage consists of used equipment of the type manufactured by Zeiss).

Defendants' reliance on various documents containing the word "ZEISS" (such as dealership agreements alleged to contain anti-competitive terms) as evidence of antitrust misuse, is misplaced. The term "Zeiss" was used in such documents to identify the manufacturer of the merchandise, and not to denote the trademark.

Defendants' antitrust misuse defense also suffers from another fatal defect: failure to connect plaintiffs sufficiently with the alleged antitrust activities to establish their legal responsibility for such activities. The activities relied on by defendants were entirely conducted by officers and employees of two New York corporations, Zeiss, N. Y. and ZIV, Inc., neither of which is a plaintiff. Zeiss, N. Y. is a wholly-owned subsidiary of plaintiff Carl Zeiss Stiftung, and ZIV, Inc. is indirectly a subsidiary, 80% of its stock being owned by Zeiss, N. Y., 10% by Zeiss Ikon, A. G., and 10% by Voigtlaender of Germany. Although the existence of a parent-subsidiary relationship is entitled to considerable weight in determining whether the parent is legally responsible for antitrust misconduct of its subsidiary, the separate corporate entities will not be disregarded unless it appears that the subsidiary is independent of the parent in form only, National Dairy Products Corp. v. United States, 350 F.2d 321 (8th Cir. 1965), vacated on other grounds, 384 U.S. 883, 86 S.Ct. 1913, 16 L.Ed.2d 995 (1966), with the result that the subsidiary is "merely the alter ego of the parent," Baim & Blank, Inc. v. Philco Corp., 148 F.Supp. 541, 544 (S.D.N.Y. 1957) (wholly owned distributing subsidiary held independent). For instance, in the *National Dairy Products* case the court found:

> "Chapman [the subsidiary] received National's approval before making capital investments; Chapman's *personnel policies* were established by National; Chapman's key employees had stock option plans to purchase National stock; Wise, a National official, had *power to override* Chapman's president * * *; Wise was kept *informed on all decisions* made by Chapman's president; Chapman's products were sold under the Sealtest trade name [National's trademark]; Wise spent many months in Kansas City (where Chapman Dairy was located); Chapman's production reports were submitted to National for approval and

National's officials often conducted the monthly sales department meetings where prices, market conditions, costs and competitors' prices were discussed." (Emphasis added) (350 F. 2d at 326)

In contrast to the control exercised by the parent over its subsidiary's activities in *National Dairy Products Corp.*, the proof here reveals that the operations and activities of Zeiss, N. Y. and ZIV, Inc. were conducted independently by them and not directed or controlled by plaintiffs. Although one of the five directors of Zeiss, N. Y. has been a member of the Board of Management of the Stiftung, and two others were formerly employed by it, Zeiss, N. Y. purchases instruments from plaintiffs for its own account at the same prices charged to distributors throughout the rest of the world, including those not affiliated with plaintiffs, and it resells the instruments to dealers and other purchasers in the United States in accordance with terms established by it, not the plaintiffs. Although most of its stock in trade consists of merchandise purchased from the Stiftung, it also sells merchandise manufactured by other firms bearing trademarks other than the Zeiss marks. Furthermore, certain instruments bearing the Zeiss trademarks are distributed in the United States by Keuffel & Esser, Inc. and Transcontinental Corp., in which neither Zeiss, N. Y. nor the Stiftung has any interest.

In the case of ZIV, Inc. none of its officers or directors are officers or directors of either of the plaintiffs, except that one member of its Board is an officer of plaintiff Zeiss Ikon. Like Zeiss, N. Y., ZIV, Inc. buys cameras and other photographic equipment from Voigtlaender of Germany for its own account and resells to dealers.

The independence of the operations of Zeiss, N. Y. and ZIV, Inc. is further evidenced by proof that their employees are hired and paid by them and not by plaintiffs. Zeiss, N. Y. and ZIV, Inc. also keep their own separate books and

records in New York, prepare their own financial statements and tax returns, pay their own operating expenses, have their own pension and health insurance plans, and their own bank accounts in New York. It is particularly significant that neither Zeiss, N. Y. nor ZIV, Inc. has consulted with either of the plaintiffs, Voigtlaender or with any other affiliate of plaintiffs, with respect to appointment or termination of dealers, establishment of prices to customers in the United States or determination of discounts or bids on public contracts in the United States. Although Zeiss, N. Y. and ZIV, Inc. from time to time make written and oral reports to the Stiftung and to suppliers in Germany with respect to the results of the company's operations in the United States and conditions in the United States market, including competitive and price conditions, there is no proof that the competitive practices, prices or other distribution activites of Zeiss, N. Y. or ZIV, Inc. were directed or controlled by either of the plaintiffs.

Viewing the circumstances in their entirety, including the parent-subsidiary relationship, the limited inter-locking directorates, and the periodic reports as to operations, we conclude that defendants have failed to establish by a fair preponderance of the evidence the degree of dominion and control required to disregard the separate corporate entities. See Baim & Blank, Inc. v. Philco Corp., 148 F.Supp. 541 (E.D.N.Y.1957).

For the foregoing reasons it is unnecessary to determine whether the parties engaged in any of the alleged violations of the antitrust laws. The antitrust misuse defense is stricken and judgment may be entered in favor of plaintiffs in accordance with the Court's decision filed on November 7, 1968.

The foregoing shall, in accordance with Rule 52(a), F.R.C.P., constitute the findings of fact and conclusions of law supplementing the separate findings of fact filed with respect to the antitrust misuse defense.

Settle order.