The CLOROX COMPANY, Plaintiff–
Counter–Defendant–Appellant,

v.

STERLING WINTHROP, INC.;  Reckitt
& Colman, Inc., Defendants–
Appellees.

No. 1041, Docket 96–9030.

United States Court of Appeals,
Second Circuit.

Argued Jan. 29, 1997.

Decided June 26, 1997.

Kim J. Landsman, New York City (Robert W. Lehrburger, Carin G. Reynolds, Judith Jobin, Patterson, Belknap, Webb & Tyler LLP, New York City, on the brief), for Plaintiff–Counter–Defendant–Appellant.

Paul C. Curnin, New York City (Eleanor M. Fox, Lawrence M. Young, Pieter Van Tol, Jennifer A. Hand, Simpson Thacher & Bartlett, New York City, on the brief), for Defendants–Appellees.

Before: WALKER, PARKER and HEANEY,* Circuit Judges.

PARKER, Circuit Judge:

The Clorox Company ("Clorox") appeals from a decision of the United States District

---

* The Honorable Gerald W. Heaney, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Court for the Eastern District of New York (Manuel Real, *J.*) granting summary judgment to Sterling Winthrop, Inc. ("Sterling") and Reckitt & Colman, Inc. ("Reckitt") on Clorox's antitrust claims under Sections One and Two of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. Clorox, which recently acquired the PINE–SOL trademark, challenges a settlement agreement that its predecessor-in-interest, American Cyanamid Company ("Cyanamid") entered into in 1987 (the "1987 Agreement") with Sterling, the prior owner of the LYSOL trademark. The agreement modified an earlier trademark settlement agreement, entered into in 1967 (the "1967 Agreement") between the parties' predecessors. Each of the agreements derives from a trademark dispute between the owners of the PINE–SOL and LYSOL marks dating from the 1950s. The 1987 Agreement contains detailed provisions regulating the way PINE–SOL disinfectant products may be advertised and packaged and restricting the types of PINE–SOL disinfectant products that may be sold. Clorox argues that the 1987 Agreement unlawfully restricts competition because it serves no valid trademark purpose, as there is no longer any likelihood of consumers confusing the LYSOL and PINE–SOL marks, and it prevents Clorox from using the popular PINE–SOL brand to enter cleaning markets dominated by LYSOL-brand products. We hold that because the 1987 Agreement indisputably limits only the way that one competing trademark may be used, and does not significantly affect any competitor's ability to compete, it does not violate the antitrust laws. Accordingly, we affirm the judgment of the district court.

## I. BACKGROUND

### A. *The Parties and Their Products*

The undisputed facts developed on the summary judgment record below are as follows. Clorox makes and sells household cleaner-disinfectant products, including PINE–SOL–brand products acquired from Cyanamid in 1990. PINE–SOL is the oldest and best-selling pine-oil cleaner. The trademark has been used since 1945, and possibly as early as 1929. It has been federally registered since 1957. Today, the PINE–SOL mark appears on various pine-oil cleaners, including the original liquid product packaged in bottle form, a PINE–SOL spray pump, and the more recent innovation, Lemon Fresh PINE–SOL. Clorox advertises PINE–SOL as "America's # 1 Pine Cleaner."

Clorox is one of the largest producers of cleaning products in the world. In addition to the PINE–SOL brand, it manufactures bleaches and cleaners under many famous trademarks, including CLOROX CLEAN–UP, FORMULA 409, SOFT SCRUB, TI-LEX, LESTOIL, and TACKLE, among others. Clorox's liquid-cleaner products, PINE–SOL and CLOROX CLEAN–UP, are the top two dilutable cleaning products on the market. Overall, as of June 1996, Clorox enjoyed a thirty-seven percent share of the all-purpose household cleaning market. Sterling acquired the LYSOL mark in 1966. Reckitt purchased Sterling's assets in 1994, including the LYSOL line. As of June 1996, Reckitt enjoyed close to fifteen percent of the all-purpose household cleaning market, in contrast to Clorox's market share of thirty-seven percent.

The LYSOL brand name arrived on the market a few decades before PINE–SOL. LYSOL has been a federally registered trademark for disinfectants since 1906, and for cleaning products in general since the 1920s. LYSOL is famous as an aerosol spray disinfectant. The LYSOL name also marks other products including a liquid disinfectant, LYSOL PINE ACTION pine cleaner; LYSOL DIRECT multi-purpose spray cleaner; LYSOL BASIN, TUB, AND TILE CLEANER; and LYSOL and LYSOL CLING toilet bowl cleaners, among other products. The LYSOL name has become virtually synonymous with household disinfectants. The LYSOL aerosol spray disinfectant is in a class of its own, as only small brand-name products compete against it.

### B. *The History of the Dispute*

The LYSOL and PINE–SOL marks have not coexisted amicably. The owners of these marks have been battling ever since the owners of PINE–SOL sought to register the trademark with the U.S. Patent office in the

1940s.[1] When the maker of PINE–SOL products initially attempted to register the PINE–SOL mark, the owner of the LYSOL mark opposed the registration. The Examiner in Chief of the U.S. Patent Office denied registration of PINE–SOL on account of what the Examiner determined to be a confusing similarity between the PINE–SOL and LYSOL marks. At the time, PINE–SOL was written as one word, similar to the way LYSOL appears. The Examiner reasoned that "Pine" can be slurred as "Pi" and "Pi–Sol" can thereby be confused with "LY–SOL." *See Lehn & Fink Prods. Corp. v. Magnolia Chem. Co.*, 95 U.S.P.Q. (BNA) 57, 58 (Oct. 2, 1952).

Despite the Examiner's decision, the owners of the PINE–SOL mark continued to use it. Sterling's predecessor then brought suit to protect its senior LYSOL mark. In 1956, to settle the litigation, Sterling's and Clorox's predecessors executed a settlement agreement (the "1956 Agreement"). In the 1956 Agreement, the owner of PINE–SOL agreed to use the trademark only with preparations that include pine oil as an active ingredient, to use an illustration of pine or evergreen trees in association with the trademark on packaging labels, and to maintain separation between the two words "PINE" and "SOL." The 1956 Agreement permitted registration of the PINE–SOL trademark as a "general household cleaner consisting primarily of pine oil" or as a "pine oil cleaner, disinfectant and deodorant." The agreement explicitly left open the rights of the PINE–SOL owners to use the trademark on products other than a liquid dilutable cleaner, which was the subject of the registration.

In 1965, controversy erupted again. The owners of the LYSOL trademark sued Cyanamid, which had since purchased the PINE–SOL trademark, after Cyanamid introduced the PINE–SOL trademark into the heart of the LYSOL product category, aerosol spray disinfectants. The owners of LYSOL also opposed trademark applications whereby Cyanamid sought to register the trademark PINE–SOL for a wall and floor cleaner.

The parties resolved their differences in the 1967 Agreement, which, by its terms, superseded the 1956 Agreement.

The 1967 Agreement prohibited the use of the PINE–SOL mark on any "disinfectant product," including "any product which is offered for sale, sold or promoted solely or in part" as a disinfectant or "as possessing or containing any disinfectant." In return, the 1967 Agreement granted Cyanamid the right to introduce various cleaning products under the PINE–SOL name, including "soaps or detergents, laundry preparations, finishing products for hard or soft surfaces, or deodorants." It also allowed Cyanamid to introduce agricultural fungicides, and insecticides and rodenticides, under the PINE–SOL mark. The 1967 Agreement provided that Cyanamid could continue to promote PINE–SOL as primarily a liquid cleaner with disinfecting properties, subject to the same limitations provided in the 1956 Agreement. Cyanamid agreed to discontinue manufacturing the PINE–SOL spray disinfectant, the subject of the 1965 lawsuit.

Nearly two decades later, in 1983, the battle resumed. Cyanamid sued Sterling for marketing a product called LYSOL PINE ACTION in a bottle similar to the one used by PINE–SOL. Cyanamid argued that the 1967 Agreement contained a negative covenant prohibiting Sterling from introducing LYSOL in the pine-oil product category. Cyanamid also claimed that Sterling's actions constituted unfair competition and trade dress infringement.

A few years later, with the 1983 action still pending, Cyanamid attempted to market a non-aerosol pump spray disinfectant under the PINE–SOL name. As a result, Sterling sued Cyanamid in 1987. Sterling and Cyanamid resolved both lawsuits in the 1987 Agreement. The 1987 Agreement modified the terms of the 1967 Agreement in important ways. Cyanamid obtained the ability to market a "multi-purpose pump spray household cleaner with disinfecting properties."

---

**1.** The first district court decision in this case examines in detail the background of the trademark dispute involving the LYSOL and PINE–SOL marks, and the resulting agreements reached by the owners of the two marks. *See Clorox Co. v. Winthrop*, 836 F.Supp. 983 (E.D.N.Y.1993).

Cyanamid obtained this limited consent from Sterling subject to many conditions, however. These include the following, which Clorox now characterizes as the 1987 Agreement's "most anticompetitive provisions":

- ¶ 3(c)-(d) and ¶ 4(e)—restricts the sale of "disinfectant products" under the PINE–SOL mark: only the basic liquid cleaner and a pump spray may be sold "in part" as disinfectants under the mark. The product restrictions allow only one "form, scent or formula" of these two PINE–SOL products to be sold "in a single geographic area at the same time." The provisions permit Clorox to market other disinfectant products with the PINE–SOL mark used as an endorsement mark for products sold under other trademarks, subject to limitations on the size and placement of the mark.

- ¶ 4(a)—requires that the original PINE–SOL product be "sold, advertised, and promoted primarily as a cleaner rather than primarily as a disinfectant product." This includes the requirement that the words "cleans" or "cleaner" be set forth before the words "disinfectant" or "disinfects" and that the words "cleans" or "cleaner" be more prominent.

- ¶ 4(c)—prevents PINE–SOL products from being sold as anything other than generic cleaners, as opposed to special purpose cleaners like bathroom cleaners.

In return for allowing Cyanamid to market the disinfectant spray, Sterling obtained Cyanamid's permission to market LYSOL PINE ACTION CLEANER.

Clorox purchased the PINE–SOL assets in 1990, subject to the 1987 Agreement.

### C.  *Proceedings Below*

This antitrust suit is the latest, though we dare not say the last, stage of the ongoing fight between the owners of the LYSOL and PINE–SOL marks. Clorox filed this action in January 1992 after Sterling obtained a preliminary injunction in New Jersey state court against a television commercial for one of Clorox's PINE–SOL products. The

PINE–SOL commercial allegedly violated the advertising restriction in the 1987 Agreement preventing Clorox from emphasizing PINE–SOL's disinfectant properties.

Clorox brought this action alleging that the 1987 Agreement serves no legitimate trademark purpose because there is no longer the likelihood of consumers confusing the LYSOL and PINE–SOL marks. Clorox claims that in restricting the way Clorox can use the PINE–SOL mark to compete, it violates the prohibition in Section One of the Sherman Act of unlawful agreements in restraint of trade. *See* 15 U.S.C. § 1. Clorox also alleges that the agreement violates Section Two of the Sherman Act because the agreement was being used unlawfully by Sterling, and now is being so used by Reckitt, to perpetuate a monopoly in certain cleaner-disinfectant markets. *See id.* § 2. The high barrier to introducing new household cleaning products, in the form of advertising costs and high risk, according to Clorox, requires that Clorox be allowed to use the already famous PINE–SOL mark to compete effectively against Reckitt in the alleged markets LYSOL products dominate.

Prior to discovery in this action, Sterling moved for summary judgment. Judge Raymond Dearie, who presided over the case initially, denied the motion, ruling that "[m]isusing a trademark for anticompetitive purposes can violate the antitrust laws" and observing that "several of the Agreement's restrictions do appear to go beyond that which is necessary to protect LYSOL's senior mark." *Clorox I*, 836 F.Supp. at 991, 992. Judge Dearie determined that further discovery was warranted. *Id.* at 992.

Accordingly, discovery began in 1994. By 1995, the parties had exchanged over a million pages of documents. On August 7, 1995, Judge Manuel Real, who had taken over the case from Judge Dearie, ordered the parties to file summary judgment motions on two days' notice.[2] The defendants, Sterling and Reckitt, filed their summary judgment motion two days later. Clorox objected to cut-

---

**2.** Judge Real is a judge of the Central District of California, who sat by designation as a visiting judge to the Eastern District of New York.

ting off discovery, claiming that it had not been afforded the opportunity to conduct depositions. In response, Judge Real gave Clorox until September to submit additional briefing and affidavits in support of its opposition to the defendants' motion.

In June 1996, Judge Real granted the motion, reasoning that Clorox had shown "no competitive limitation on the owner of the PINE–SOL market [sic]; no price fixing; no division of markets territorial or product; no group boycott; or concerted refusals to deal with a competitor." He concluded that the settlement agreements stemmed out of legitimate trademark concerns and "uniformly express a desire of the parties to protect the use of the LYSOL trademark and PINE–SOL mark." *Clorox Co. v. Sterling Winthrop, Inc.*, 932 F.Supp. 469, 471 (E.D.N.Y. 1996). Clorox appealed.

## II. DISCUSSION

On appeal, Clorox pursues its claim that the 1987 Agreement between Cyanamid and Sterling serves no valid trademark purpose and is therefore an illegal agreement in restraint of trade. Clorox also presses its claim that the 1987 Agreement illegally perpetuates Reckitt's LYSOL monopoly in certain alleged disinfectant cleaning markets. We consider, and reject, each of these contentions in turn.

### A. *Summary Judgment Standard*

■ This appeal arises from a grant of summary judgment, and therefore we must review the underlying evidence in the light most favorable to the nonmoving party, Clorox. *See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir.1993). As we noted in *Capital Imaging*, summary judgment is an important procedural device in antitrust cases, because it enables courts to efficiently resolve potentially costly and time-consuming litigation which can chill competitive forces. *Id.* We must determine whether there is a genuine factual issue for trial, which requires that the party opposing summary judgment " 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Id.* (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). As we have explained, "[i]n the context of antitrust litigation the range of inferences that may be drawn from ambiguous evidence is limited; the nonmoving party must set forth facts that tend to preclude an inference of permissible conduct." *Id.* (citing *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57).

### B. *Agreement in Restraint of Trade: Sherman Act Section One*

Section One of the Sherman Antitrust Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 1. Clorox argues that the 1987 Agreement is unlawful because it serves no legitimate trademark purpose in preventing Clorox from advertising PINE–SOL products primarily as disinfectants and prohibiting Clorox from producing certain disinfectant products under the PINE–SOL name.

■ We must first determine the proper framework for analyzing Clorox's Section One claim. We begin with the fact that Clorox challenges a trademark agreement. Such agreements are common, and favored, under the law. *See, e.g.,* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:25 (4th ed.1996) (discussing utility of trademark agreements whereby parties agree to format, product line, and territorial restrictions to limit confusion); *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 737–40 (2d Cir.1994) (involving a comprehensive trademark agreement between Bayer AG and Sterling Drug, Inc., whereby Bayer AG agreed not to enter certain marketing channels in the United States using the Bayer trademark). Unlike trademark agreements that in reality serve to divide markets, *see, e.g., Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), and thus have been condemned as illegal *per se* under the antitrust laws, the agreement at issue here merely regulates the way a competitor

can use a competing mark. Contrary to Clorox's argument, the agreement does not effect any of the types of restraints that have historically been condemned as illegal *per se,* such as price fixing, market divisions, tying arrangements, or boycotts. Accordingly, we must examine the summary judgment evidence in accordance with "rule of reason" analysis. *See Capital Imaging,* 996 F.2d at 542–43 ("Most cases fall outside the[ ] narrow, carefully demarcated categories held to be illegal *per se,*" such as horizontal and vertical price-fixing, division of a market into territories, certain tying arrangements, and some group boycotts. "In the general run of cases a plaintiff must prove an antitrust injury under the rule of reason.") (citing cases).

 Applying rule of reason analysis, we must determine whether the restraints in the agreement are reasonable in light of their actual effects on the market and their pro-competitive justifications. *See Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir. 1995) (Walker, J.) (under rule of reason analysis, the " 'factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited.' " ) (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)); *Capital Imaging,* 996 F.2d at 543 (determining whether conduct tends to promote or destroy competition, under the rule of reason, "requires a careful and complete analysis of the competitive effects of the challenged restraint"). As we outlined in *K.M.B.,* "[e]stablishing a violation of the rule of reason involves three steps." 61 F.3d at 127. First, the " '[p]laintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market....' " *Id.* (quoting *Capital Imaging,* 996 F.2d at 543). Then, "[i]f the plaintiff succeeds, the burden shifts to the defendant to establish the 'pro-competitive "redeeming virtues" ' of the action. Should the defendant carry this burden, the plaintiff must then show that the same pro-competitive effect could be achieved through an alternative means that is less restrictive of

competition." *Id.* (internal citations omitted) (quoting *Capital Imaging,* 996 F.2d at 543; *Bhan v. NME Hosps., Inc.,* 929 F.2d 1404, 1413 (9th Cir.1991)). Ultimately, the goal is to determine whether restrictions in an agreement among competitors potentially harm consumers. *See SCFC ILC, Inc. v. Visa USA, Inc.,* 36 F.3d 958, 965 (10th Cir. 1994). The focus of the inquiry on consumers "cannot be overemphasized and is especially essential when a successful competitor," as here, "alleges antitrust injury at the hands of a rival." *Id.* We examine Clorox's Section One claim according to this analytical framework.

### 1. Adverse Effects

 We begin by noting that Clorox faces a difficult task of proving that the 1987 Agreement harms competition in general. As other courts and commentators have observed, trademarks are by their nature non-exclusionary. A trademark, unlike other intellectual property rights, does not confer a legal monopoly on any good or idea; it confers rights to a name only. Because a trademark "merely enables the owner to bar others from use of the mark, as distinguished from competitive manufacture and sale of identical goods bearing another mark, .... the opportunity for effective antitrust misuse of a trademark, as distinguished from collateral anti-competitive activities on the part of the manufacturer or seller of the goods bearing the mark, is so limited that it poses a far less serious threat to the economic health of the nation." *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 298 F.Supp. 1309, 1314 (S.D.N.Y.1969), *aff'd in relevant part,* 433 F.2d 686 (2d Cir.1970); *see also* 4 McCarthy § 31:96, at 31–145 ("[B]ecause the economic exclusivity of a trademark is far less than that of a patent, there is far less opportunity for a trademark to play and integral role in violations of the antitrust laws."). As Judge Mansfield noted in *Carl Zeiss,* "in almost every reported instance where the antitrust misuse of a trademark has been raised as a defense [in a trademark infringement suit], it has been rejected. In the great majority of such cases the evidence revealed the anti-

trust activities to be collateral" to trademark protection. *See* 298 F.Supp. at 1314.

The trademark agreement at issue here does no more than regulate how the name PINE–SOL may be used; it does not in any way restrict Clorox from producing and selling products that compete directly with the LYSOL brand, so long as they are marketed under a brand name other than PINE–SOL. Accordingly, at first blush it would not appear to restrict Clorox's, much less any other competitor's, ability to compete in the markets LYSOL products allegedly dominate.

In a case that considered a similar antitrust challenge to a trademark agreement, the court determined that because the agreement did not restrict a competitor's ability to market products under names other than the one precluded by the agreement, the defendant-counter-claimant did not state an antitrust claim. *See California Packing Corp. v. Sun–Maid Raisin Growers,* 165 F.Supp. 245 (S.D.Cal.1958), *aff'd,* 273 F.2d 282 (9th Cir. 1959). After the owner of the SUNKIST mark sought to restrain the use of the SUN–MAID mark on products other than raisins, the owner of the SUN–MAID mark counterclaimed under Section Two of the Sherman Act. The court dismissed the antitrust claim, reasoning:

> [The agreement] does not prevent Sun–Maid from engaging in the production of canned products of fruits and vegetables other than raisin and raisin products. It merely restricts the use of the trademark Sun–Maid to such products. Sun–Maid's predecessor was free, and Sun–Maid itself has been free all these years, to can anything,—vegetables or fruits,—and market them under any name so long as that name is not Sun–Maid.

*Id.* at 251. Likewise, in *The Seven–Up Co. v. No–Cal Corp.,* 183 U.S.P.Q. 165, 1974 WL 886 (E.D.N.Y.1974), the owner of soft-drink trademarks sued a competitor for trademark infringement and the defendant counterclaimed under Section Two of the Sherman Act. *Id.* 183 U.S.P.Q. at 165–66. The court determined that the antitrust claim had no merit:

> Since all that is required of a defendant in order to escape the clutches of an alleged trademark monopoly is to market his product under a different name, the damages which may flow from a trademark infringement action cannot support an anti-trust counterclaim.

*Id.* at 166.

As these cases illustrate, because the antitrust laws protect competition, not competitors, *see Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), and trademarks are non-exclusionary, it is difficult to show that an unfavorable trademark agreement raises antitrust concerns. Even if such an agreement only marginally advances trademark policies, the antitrust laws do not exist to protect competitors from agreements that in retrospect turn out to be unfavorable to the complaining party. The antitrust laws protect consumers by prohibiting agreements that unreasonably restrain overall competition; thus, in order to fulfill the requirement of showing an actual adverse effect in the relevant market, "the plaintiff must show more than just that he was harmed by the defendant's conduct." *See K.M.B.,* 61 F.3d at 127. Accordingly, Clorox cannot make a case under the antitrust laws unless it demonstrates that the 1987 Agreement may significantly harm competition as a whole, regardless of whether the agreement is entirely necessary to protect Reckitt's trademark rights. *See* 1A Rudolf Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 4.53, at 3 (4th ed. 1983 & Supp. IV 1993) ("[A]n excessive claim to exclusive rights in words, colors, forms, etc. which should be freely available to all competitors, e.g., descriptive or generic words, is not a violation of the antitrust laws unless it leads to an unreasonable restraint of trade, or prevents entry of new competitors into the market."). This Clorox has not shown.

To escape the fact that the 1987 Agreement does not prevent Clorox or any other competitor from marketing products that compete against Reckitt's LYSOL brand, Clorox relies on what is known in academic marketing literature as the megabrand theory. *See, e.g.,* Edward M. Tauber, "Brand Leverage: Strategy for Growth in a Cost-

Control World," *J. Advertising Research* 26 (Aug./Sep.1988) [hereinafter "Brand Leverage"]; David A. Aaker, *Managing Brand Equity: Capitalizing on the Value of a Brand Name,* 208 (1991). Briefly, this marketing theory posits that due to the high costs of advertising new mass-marketed products, and the high risk of such products failing, it is important to use established brand names to introduce new products. Clorox argues that, deprived of the PINE–SOL name, it cannot effectively penetrate the alleged disinfectant cleaning markets dominated by the popular LYSOL brand.

In addition to the fact that the marketing literature relied upon by Clorox concerns a period of economic stagnation in the late 1980s, imposing especially high barriers to the introduction of new products, *see* Tauber, "Brand Leverage," at 27, and may therefore be less relevant today, there are several problems with Clorox's argument regarding entry barriers. First, and most obviously, the CLOROX name itself is a megabrand with substantial brand equity. The evidence adduced by Clorox fails to support its argument that only its PINE–SOL brand is capable of being leveraged into the alleged cleaner-disinfectant markets dominated by LYSOL products. Clorox presents evidence of a few anecdotal accounts of new products that have failed, allegedly because the leveraged trademark's equity did not fit the new market. Because products can fail for any number of reasons, such evidence is of limited probative value. Clorox also presents the affidavit of the head of its marketing department stating that the Clorox name is unsuited for marketing spray disinfectants. It is clear, however, that Clorox has enjoyed great success in extending its own name into new cleaning-market niches, and developing new products under new names in the past. To suggest that Clorox cannot now do so is purely speculative.

More importantly, there is no evidence to support the theory that only Clorox is capable of competing against LYSOL products in the alleged markets LYSOL dominates. The overall household cleaning industry is the battleground of some of the largest corporations in the country, wielding numerous megabrands. The industry is made up of firms with the resources to develop new products and market them, as these companies have repeatedly done. In the past, these companies regularly bought and sold trademarks, as this case illustrates, as changing economic conditions dictated. *See id.* at 26. Each of these major corporations, like Clorox, has significant goodwill attached to its own name, and to the trademarks it owns.[3]

Although the cost of producing and marketing new disinfectant sprays may be high for competitors of Reckitt, nothing suggests that these companies do not have the names and resources to do so. As one commentator has noted, "[e]stablished buyer preferences," such as those alleged here with respect to LYSOL, "will not ordinarily be a serious entry barrier." 2 Philip E. Areeda & Donald F. Turner, *Antitrust Law* ¶ 409d, at 302 (1978). Although producing and introducing new products are attended with high costs to the entering producer, "[s]ome of the costs of creating or maintaining buyer preferences must eventually be repeated," subjecting the established producer to high costs as well. *See id.* at 303. Where, as here, established large competitors can afford to invest their resources over a long period of time, the expense and risk of failure should be less of a deterrent to entry. *See id.* Nothing here suggests that the other large companies that produce cleaning products are incapable of successfully investing their resources, in the form of capital and brand name equity, to enter the markets LYSOL products allegedly dominate. Clorox has presented no evidence to the contrary.

In addition, the 1987 Agreement, and the 1967 Agreement that it modified, do not entirely prevent Clorox from using the PINE–SOL name to compete against LYSOL products. Clorox is free to market a cleaner-disinfectant that competes head-to-head against LYSOL liquid disinfectant cleaner. Clorox is only hampered by the restriction

---

**3.** These include Procter & Gamble (MR. CLEAN, TOP JOB, SPIC AND SPAN, COMET, and DAWN), S.C. Johnson (GLADE, VANISH, PLEDGE and WINDEX), Dow (FANTASTIK and DOW); The Dial Corp (DIAL and PUREX); and Colgate–Palmolive (AJAX and PALMOLIVE).

that PINE–SOL be advertised primarily as a cleaner rather than primarily as a disinfectant. There is no prohibition on Clorox promoting the original PINE–SOL product—a product that has enjoyed enormous success despite the limitations imposed by the 1987 Agreement—in part as a disinfectant. It did so until recently. Although the agreement prohibits Clorox from producing an aerosol disinfectant spray under the PINE–SOL name, it does not prevent Clorox from producing such a spray using an endorsement mark indicating that the product is from the makers of PINE–SOL, although Clorox's ability to do so is subject to limitations on the size and placement of the mark.

██ It may well be that the restrictions in the agreement prevent Clorox from competing as effectively as it otherwise might. Endorsement marks may not be as effective as using a name brand as a primary mark, advertising a product primarily as a disinfectant may be more lucrative, and using the Clorox name may be less effective than using the popular PINE–SOL name to market disinfectant products. The antitrust laws do not guarantee competitors the right to compete free of encumbrances, however, so long as competition as a whole is not significantly affected. *See, e.g., K.M.B.*, 61 F.3d at 128 (rejecting antitrust claim under Section One where exhaust parts distributor, after being prevented from distributing the defendant's products, "continued to compete [ ] by offering [another manufacturer's products] ... [and] by offering superior pricing and service ...," and where competition as a whole would not be affected); *SCFC ILC*, 36 F.3d at 972 (rejecting claim that Visa violated the antitrust laws by preventing Sears from introducing a new credit card under the Visa aegis, where Visa did not prevent Sears from accessing the credit card market, concluding that Sears's desire to compete more effectively was not "the proverbial sparrow the Sherman Act protects"); *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir.1990) (rejecting antitrust claim where plaintiff alleged that it would have been able to compete more effectively had a competitor's magazine not declined to grant the plaintiff advertising space). Although Clorox's predecessor may not have struck the

best bargains when negotiating the trademark agreements with the previous LYSOL owners, the fact that Clorox can still compete despite the 1987 Agreement, and that numerous other companies are also capable of competing against Reckitt, seriously undermines Clorox's claim.

In light of the fact that the agreement leaves many other companies who produce cleaning products capable of competing against Reckitt's LYSOL products, including Clorox, we find unavailing Clorox's attempt to bolster its Section One claim with evidence of Reckitt's market power in various alleged cleaner-disinfectant categories. Putting aside the issue of whether "pure" disinfectant cleaners and aerosol spray disinfectants are relevant markets here, as Clorox claims, we held in *K.M.B.* that "a showing of market power, while necessary to show adverse effect indirectly, is not sufficient. There must be other grounds to believe that the defendant's behavior will harm competition market-wide, such as the inherent anti-competitive nature of defendant's behavior or the structure of the interbrand market." 61 F.3d at 129. Here, for the reasons we have previously explained, Clorox has not shown that the 1987 Agreement significantly restricts Clorox, or restricts at all any of the other large cleaner-manufacturers, from competing against Reckitt. Accordingly, even if true, Clorox's claim that Reckitt maintains a seventy-percent share of the alleged pure liquid disinfectant cleaner market, and over a ninety-percent share of the alleged aerosol spray disinfectant market, and that LYSOL products now earn super-competitive profits, does not establish that the restrictions in the 1987 Agreement violate Section One. The agreement simply does not significantly restrict Clorox's, or other competitors', ability to enter these alleged markets.

### 2. *Pro–Competitive Justifications*

Only if a plaintiff succeeds in establishing the actual adverse effects of an alleged restraint does the burden shift to the defendant to establish its pro-competitive redeeming virtues. *See id.* at 127. Accordingly, as Clorox has not shown that the 1987 Agree-

ment can significantly affect competition as a whole, it is immaterial whether the Agreement is entirely necessary to protect the senior LYSOL mark. *See id.; Capital Imaging,* 996 F.2d at 547 ("Such [pro-competitive] justifications are unnecessary where [the plaintiff] ... has not carried its own initial burden of showing a restraint on competition."); *see also* 1A Callman § 4.53, at 3 (Even the effort to assert trademark rights beyond those justified by trademark policies cannot violate the antitrust laws "unless it leads to an unreasonable restraint of trade, or prevents entry of new competitors into the market.").

■ We note, however, that the pro-competitive justifications of the agreement bolster our conclusion that the agreement does not violate the antitrust laws. As we stated previously, trademark agreements are favored in the law as a means by which parties agree to market products in a way that reduces the likelihood of consumer confusion and avoids time-consuming litigation. Parties such as Clorox, Sterling, and their predecessors, are in a position to structure such agreements in the way that the parties believe best accommodates their interests in light of trademark law. Accordingly, in the absence of any evidence that the provisions relating to trademark protection are auxiliary to an underlying illegal agreement between competitors—such as the territorial market division condemned in *Timken*—and absent exceptional circumstances, we believe the parties' determination of the scope of needed trademark protections is entitled to substantial weight. At the time of the execution of such an agreement, the parties are in the best position to determine what protections are needed and how to resolve disputes concerning earlier trademark agreements between themselves. While the intent of the parties may not always be determinative, it is usually unwise for courts to second-guess such decisions. In the absence of evidence to

the contrary it is reasonable to presume that such arms-length agreements are pro-competitive.

The fact is, Clorox now complains about the antitrust consequences of the very agreement its predecessor freely entered, and which it voluntarily assumed, an agreement Clorox now claims harms its ability to compete. There is no evidence that Cyanamid entered the agreement under duress. Although Clorox raises some ambiguous evidence to suggest Sterling's anticompetitive intent, there is not a scintilla of evidence that Cyanamid intended to conspire with Sterling to violate the antitrust laws in any way.[4] Rather, each competitor bargained freely over the potential use of the PINE–SOL name, in light of prior trademark agreements and the history of the trademark dispute between the owners of the competing LYSOL and PINE–SOL marks.

■ While it is settled that a good intention will not relieve a party from civil antitrust liability, intent is nonetheless important in judging the pro-competitive purposes, and thus the likely overall competitive effects, of an alleged restraint. *See Chicago Bd. of Trade,* 246 U.S. at 238, 38 S.Ct. at 244 ("The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."); *K.M.B.,* 61 F.3d at 130. Accordingly, our conclusion that the 1987 Agreement does not violate the antitrust laws because it cannot significantly harm competition in general is bolstered by the lack of evidence that it was the product of anything other than hard-nosed trademark negotiations. *Cf. Drop Dead Co. v. S.C.*

---

4. Accordingly, we are not faced with the question of whether, if Clorox made out an antitrust case that Cyanamid conspired with Sterling to violate the antitrust laws, the defendants would have a defense based on Cyanamid's role in the violation. *See United States Football League v. National Football League,* 842 F.2d 1335, 1369 (2d Cir.1988) ("It is true that a plaintiff's own anti-

competitive conduct generally cannot be raised as a defense to liability in an antitrust action. The defense may be available, however, when the plaintiff was present at the creation and had a complete and continuing involvement in the monopolization scheme." (internal citations omitted)).

*Johnson & Son, Inc.,* 326 F.2d 87, 96 (9th Cir.1963) (bringing infringement suits based on "colorable similarity rather than on exact identity" is the type of "aggressive competition and promotion that anti-trust laws seeks to protect, particularly within the limits of lawful monopolies granted by Congress" (dicta)); *Car–Freshner Corp. v. Auto Aid Mfg. Corp.,* 438 F.Supp. 82, 87 (N.D.N.Y. 1977) ("the acts of the plaintiffs in registering and enforcing the trademark in issue .... merely represent fair and aggressive competition which does not constitute a violation of the antitrust laws"). Efforts to protect trademarks, even aggressive ones, serve the competitive purpose of furthering trademark policies. Where large competitors each represent their respective trademark interests, unless one party is irrational, the result should accord with how the parties view their respective rights.

### C. *Monopolization: Sherman Act Section Two*

 Clorox also argues that the 1987 Agreement tends to further Reckitt's alleged LYSOL monopoly in various disinfectant cleaning markets. Section Two of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 2. There are two elements of a Section Two claim: "1) the possession of monopoly power in the relevant market, and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

For substantially the reasons stated above with respect to Clorox's Section One claim, we must reject Clorox's claim that the 1987 Agreement illegally tends to further a monopoly in various disinfectant markets. The agreement leaves Clorox, as well as other viable competitors in the household-cleaning industry, free to compete against Reckitt's LYSOL brand in the markets these products allegedly dominate.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is hereby affirmed. We have considered Clorox's other contentions, particularly its contention that it should have been afforded the opportunity to conduct additional discovery on the issue of the defendants' intent, and in light of the disposition above, find them to be without merit.